UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Sun Country Airlines, Inc. | ) | Bankruptcy Case No. 02-40303 |
| | ) | Chapter 7 |
| Debtor | ) | |
| _____ ) | | |

**NOTICE OF EXPEDITED HEARING AND SUPPLEMENTAL MOTION OF U.S. BANK
FOR RELIEF FROM THE AUTOMATIC STAY**

TO:    ENTITIES SPECIFIED IN LOCAL RULE 9013-3

1.    U.S. Bank National Association ("U.S. Bank"), by and through its duly authorized and undersigned attorneys, moves the Court for the relief requested below, and gives notice of hearing.

2.    The Court will hold an expedited hearing on this motion (the "Supplemental Motion") at 2:00 p.m. on March 11, 2002, before the Honorable Nancy C. Dreher at the U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, or as soon thereafter as counsel can be heard. This Supplemental Motion supplements the motion of U.S. Bank originally heard by the Court on March 6, 2002 (the "Original Motion"), and continued by the Court until 2:00 p.m. on March 11, 2002.

3.    Any response to this Supplemental Motion must be filed and delivered not later than 2:00 p.m. on March 9, 2002, which is 24 hours before the time set for the hearing (excepting Saturdays and Sundays or holidays). **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.    The Court has jurisdiction over this Supplemental Motion and the Original Motion pursuant to 28 U.S.C. §§ 157 and 1334, Rule 5005 of the Federal Rules of Bankruptcy

Filed on MAR 07 2002
Patrick G. De Wane, Clerk
By _____ Deputy Clerk

Procedure (the "Bankruptcy Rules") and Local Rule 1070-1. This is a core proceeding under 28 U.S.C. § 157(b)(G).

5.     An involuntary petition was filed against Sun Country Airlines, Inc. (the "Debtor") in the United States Bankruptcy Court for the District of Delaware on January 8, 2002. On or about January 22, 2002, the Delaware Bankruptcy Court entered an order transferring venue of the involuntary case against the Debtor to the District of Minnesota and the Minnesota Bankruptcy Court. The case is currently pending in this Court as an involuntary case under 11 U.S.C. § 303.

6.     The Original Motion and this Supplemental Motion arise under 11 U.S.C. § 362(d) and Bankruptcy Rule 4001, and are filed under Bankruptcy Rule 9014 and Local Rule 9013-1.

7.     As of March 7, 2002, the Debtor is indebted to U.S. Bank in the approximate amount of $13,964,294.56 plus accrued interest and costs and expenses allowed pursuant to a Credit Agreement dated as of April 14, 1997 between U.S. Bank and the Debtor, as amended (the "Credit Agreement"). The claims of U.S. Bank are secured pursuant to (i) a Security Agreement executed by Debtor on April 14, 1997 ("Security Agreement"), granting to U.S. Bank a senior security interest upon, among other things, all or substantially all of the Debtor's accounts, inventory, general intangibles, equipment, documents, spare parts, instruments, leases, and all other personal property of the Debtor, including an interest in the Flight Certificate issued to Debtor under 49 U.S.C. § 41102, (ii) an Aircraft Engines Spare Parts Security Agreement dated as of April 14, 1997 (the "Engines and Parts Agreement"), granting to U.S. Bank a senior security interest in, among other things, certain engines and spare parts duly recorded with the Federal Aviation Administration, (iii) a Collateral Assignment of Trademarks dated as of

2

April 14, 1997 (the "Trademark Assignment"), granting to U.S. Bank a senior security interest in certain trademarks of the Debtor, and (iv) and a supplemental Security Agreement dated as of March 5, 2002 (the "Supplemental Security Agreement") (the foregoing collateral referred to in Sections 7(i), (ii), (iii), (iv), the "Collateral"). True and correct copies of the Security Agreement, Engine and Parts Agreement and recorded Trademark Assignment are attached to the Original Motion as Exhibits A, B, and C. A true and correct copy of the Supplemental Security Agreement is attached hereto as Exhibit A.

8.    Financing statements with respect to the Security Agreement and the Engines and Parts Agreement were filed in over 25 jurisdictions, with in lieu of filings being made with the Minnesota Secretary of State's Office pursuant to the revised Article 9 on (i) November 14, 2001 as Document No. 20012164705, (ii) November 14, 2001 as Document No. 20012164716 and (iii) January 9, 2002 as Document No. 1013360003 (the original Minnesota filing, which remains effective, was made on April 16, 1997 as Document No. 1933335). U.S. Bank's security interest in all of the Collateral is perfected and constitutes a first priority security interest in virtually all of the Debtor's property. True and correct copies of the Minnesota Financing Statements are attached to the Original Motion as Exhibit D.

9.    Debtor discontinued its normal business operations on or about December 21, 2001, and publicly announced that it was seeking a purchaser, investor or third party to take over its operations. Prior to such time, the Debtor had privately stated to U.S. Bank that it was looking for a purchaser, investor or third party to take over its operations. The Debtor also is in default under the Credit Agreement.

10.    Subsequent to the filing of the involuntary petition, the Debtor received a written offer from MN Airlines, LLC ("MN Airlines") to acquire a portion of the Collateral. MN

3

Airlines desires to acquire the Collateral through a foreclosure sale conducted under the provisions of the Uniform Commercial Code and Minn. Stat. § 336.9-101 *et seq*. rather than as part of a bankruptcy proceeding, recognizing that the Debtor's cooperation may be needed to effectuate the transfer of certain Collateral in which U.S. Bank holds a security interest. The proposed disposition of Collateral pursuant to a state law foreclosure sale, on information and belief, will generate greater sale proceeds than a sale by a trustee or Chapter 11 Debtor.

11.     MN Airlines and U.S. Bank have entered into an Agreement for Sale of Collateral dated March 6, 2002 (the "Sale Agreement"), pursuant to which MN Airlines has agreed to purchase from U.S. Bank all of the respective rights and interest of the Debtor in the Collateral in Schedule I to the Bill of Sale attached thereto (the "Purchased Assets"). A true and correct copy of the Sale Agreement with Schedule I to the Bill of Sale is attached hereto as Exhibit B.

12.     In consideration of the conveyance of the Purchased Assets by U.S. Bank to MN Airlines, MN Airlines agreed to pay to U.S. Bank the sum of Two Million Nine Hundred Thousand Dollars ($2,900,000) without offset (the "Purchase Price"). The Purchase Price shall be paid to U.S. Bank as follows: (a) $500,000 immediately, and (b) the balance of $2,400,000 on the Closing Date (as such term is defined in the Sale Agreement).

13.     Given the Debtor's extensive efforts to find a purchaser of its assets, the widespread publication of those efforts, the fact that MN Airlines is the only bona fide interested purchaser, and the fact that the Purchase Price was heavily negotiated, the Purchase Price is the most accurate indicator of the fair market value of the Purchased Assets.

14.     In order to allow operations to continue until the Closing Date, MN Airlines and the Debtor have entered into that certain Credit Agreement dated March 6, 2001 (the "Interim Financing Agreement"), pursuant to which MN Airlines has agreed to extend credit to the Debtor

in the maximum principal amount of $1,500,000. However, MN Airlines's financing obligations under the Interim Financing Agreement are contingent upon the entry of an order by this Court granting U.S. Bank relief from the automatic stay allowing U.S. Bank to sell the Purchased Assets to MN Airlines. A true and correct copy of the Interim Financing Agreement is attached hereto as Exhibit C.

15.     Unless the Debtor receives financing pursuant to the Interim Financing Agreement, the Debtor's financial projections establish that the Debtor will have insufficient working capital to continue operations and the Debtor will be forced to cease immediately its current limited operations. A true and correct copy of the financial projections provided to U.S. Bank are attached to the Interim Financing Agreement as Exhibit A.

16.     The continuation of certain scheduled flights is necessary to maintain the flight certificate issued to the Debtor by the Department of Transportation under 49 U.S.C. § 41102 (the "Operating Certificate"). Without the Operating Certificate, the value of the Collateral is significantly reduced and MN Airlines will not proceed with the closing on the Purchased Assets.

17.     If an order for relief under Chapter 7 is entered in this case, the Department of Transportation will void the Operating Certificate. Without the Operating Certificate, the value of the Collateral is significantly reduced and MN Airlines will not proceed with the closing on the Purchased Assets.

18.     U.S. Bank is undersecured, and a denial of the Original Motion and this Supplemental Motion for relief from the automatic stay to allow the immediate sale of the Purchased Assets would cause the Operating Certificate and its value to a purchaser to be lost.

5

Thus, a denial of the Original Motion and this Supplemental Motion would substantially harm U.S. Bank without providing any benefit to other creditors of the Debtor.

19.    Even if the proposed sale pursuant to Article 9 does not occur and the Court enters an Order for Relief, U.S. Bank's interests are still best served by lifting the automatic stay and permitting it to dispose of the Collateral.  Without the funding by MN Airlines pursuant to the Interim Financing Agreement, the Debtor will consent to a Chapter 7 as the Debtor lacks the funding necessary to operate as a debtor in possession.  Alternative funding is unlikely since the Debtor does not have any unencumbered collateral of more than nominal value to pledge.

20.    U.S. Bank also objects to the continued use of its cash collateral due to a lack of adequate protection.  Even if the Debtor were able to continue limited operations absent a closing with MN Airlines, such operations would likely result in further losses to the estate and further diminution and erosion in the Collateral's value.  The Debtor is unable to provide U.S. Bank with adequate protection against the continued diminution and erosion in value of the use of its Collateral and there are no other secured creditors claiming an interest in the Collateral.  The Court should enter an order prohibiting the Debtor from using cash collateral, and requiring the Debtor to segregate and account for the cash collateral.

21.    As outlined in detail in the accompanying memorandum of law, cause within the meaning of § 362(d) exists for granting U.S. Bank relief from the automatic stay to exercise its state law remedies with respect to the Collateral either to MN Airlines or otherwise.  The prospect of a higher return in a non-bankruptcy disposition and the Debtor's inability to provide U.S. Bank any adequate protection against the continued diminution in value of its Collateral constitute alternative causes for granting relief from the stay.

6

22.    In addition to cause, the Debtor clearly has no equity in the Collateral and such Collateral is not necessary for an effective reorganization.  As demonstrated in the accompanying memorandum of law, the Debtor bears the burden of demonstrating that a reorganization is realistic and feasible within a reasonable time frame.  When a debtor is in a Chapter 7 proceeding, there is nothing to reorganize and relief from the stay should be granted if no equity is present in the collateral.  In fact this is not a reorganization case, nor will it be, as the Debtor cannot reorganize based on its few remaining assets and the inability to finance a true reorganization, or fund a liquidating Chapter 11.

23.    This Supplemental Motion is supported by (1) the Supplemental Memorandum in Support of Motion for Relief from the Automatic Stay; (2) the Original Motion and materials submitted in support of the Original Motion; (3) such other matters which may be presented at the hearing or prior to the Court's decision; and (4) such other matters of which the Court may take notice.

24.    If testimony is necessary to any facts relevant to this motion, the following witnesses may be offered:

David C. Larsen
U.S. Bank National Association
225 South Sixth South
Minneapolis, Minnesota 55402
Substance of testimony:  Amount of debt, value of the Purchased Assets and lack of adequate protection

David BanMiller
Sun Country Airlines, Inc.
2520 Pilot Knob Road
Mendota Heights, MN 55120
Substance of testimony:  Efforts to market the sale of the assets of the Debtor, cash needs of the Debtor, value of the Purchased Assets and lack of adequate protection

Mark Osterberg
Sun Country Airlines, Inc.
2520 Pilot Knob Road
Mendota Heights, MN 55120
Substance of testimony:  Efforts to market the sale of the assets of the Debtor, cash needs of the Debtor, value of the Purchased Assets and lack of adequate protection

Clive G. Medland or other representative of Simat, Helliesen & Eichner, Inc.
90 Park Avenue
New York, New York 10016
Substance of testimony:  Value of the Purchased Assets

Robert Daly
c/o Jay Salmen
Kennedy & Graven
470 Pillsbury Center
200 South Sixth Street
Minneapolis, MN 55402
Substance of testimony:  MN Airlines's valuation of Purchase Assets and willingness to engage in the transaction

WHEREFORE, U.S. Bank prays that this Court enter an order (1) granting U.S. Bank relief from the automatic stay in accordance with 11 U.S.C. § 362(d) to exercise its state law remedies with respect to all of its Collateral; (2) prohibiting the Debtor from using cash collateral, and requiring the Debtor to segregate and account for cash collateral; and (3) granting such other and further relief as the Court deems just under the circumstances.

Dated this 7th day of March, 2002.

DORSEY & WHITNEY LLP

By: _____
John C. Thomas (MN Bar # 109071)
Diane Malfeld (MN Bar # 66849)
Todd Pearson (MN Bar #230935)
50 South Sixth Street
Minneapolis, MN  55402
(612) 340-2600

ATTORNEYS FOR U.S. BANK
NATIONAL ASSOCIATION

8

## VERIFICATION

I, David C. Larsen, an employee of U.S. Bank National Association, the movant named in the foregoing Notice of Expedited Hearing and Supplemental Motion of U.S. Bank for Relief From Automatic Stay, declare under penalty of perjury that the facts related to the foregoing are true and accurate to the best of my knowledge, information and belief.

Dated:  March 7, 2000

_____
David C. Larsen

Subscribed and sworn to before me
this 7th day of March, 2002.



Notary Public

JOHN C. THOMAS
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2005

EXHIBIT A

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT, dated as of March 5, 2002 ("Agreement"), is made and given by SUN COUNTRY AIRLINES, INC., a corporation organized under the laws of the State of Minnesota (the "Grantor"), to U.S. BANK NATIONAL ASSOCIATION, a national banking association (the "Secured Party").

## RECITALS

A.     The Grantor and the Secured Party entered into a Credit Agreement dated as of April 14, 1997 (as amended, the "Credit Agreement"), pursuant to which the Secured Party extended to the Grantor certain credit accommodations.

B.     The obligations of the Grantor under the Credit Agreement are secured by, among other things, a security interest granted by the Grantor to the Secured Party pursuant to a Security Agreement dated as of April 14, 1997 (as amended, the "1997 Security Agreement"), which granted to the Bank a security interest in all personal property of the Grantor, an Aircraft Engines Spare Parts Security Agreement dated as of April 14, 1997 (as amended, the "Engine Collateral Agreement") which granted to the Bank a security interest in, among other things, certain engines and parts, and a Collateral Assignment of Trademarks dated as of April 14, 1997 which granted to Bank a security interest in, among other things, certain trademarks (the "Trademark Agreement") (the 1997 Security Agreement, the Engine Collateral Agreement and the Trademark Agreement being, collectively, the "Existing Collateral Agreements"). The security interest granted pursuant to the Existing Collateral Agreements was perfected by, among other things, the filing of various financing statements.

C.     The Grantor is in default on its obligations under the Credit Agreement. On or about January 8, 2002, an involuntary bankruptcy petition was filed against the Grantor under Title 11 of the United States Code. An order for relief has not been entered in the bankruptcy proceeding.

D.     Since the filing of the involuntary bankruptcy petition against the Grantor, the Grantor has continued to use the proceeds of collateral in which the Secured Party has a perfected security interest. To induce the Secured Party to continue to permit use of cash collateral from operations of the Grantor and to provide certain other accommodations to the Grantor, the Grantor has agreed to enter into this Agreement to secure repayment of all Obligations (as such term is defined in the Credit Agreement) of the Grantor to Secured Party and to secure against diminution of Secured Party's collateral as a result of Grantor's use of Secured Party's cash collateral.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, including but not limited to a limited right for the Grantor to continue to use cash collateral, the Grantor hereby agrees with the Secured Party for the Secured Party's benefit as follows:

030502

Section 1.    <u>Defined Terms</u>.

1(a)    Unless otherwise defined, all capitalized terms herein shall have the meanings assigned to them in the 1997 Security Agreement and such meanings are hereby incorporated herein by reference.

1(b)    As used in this Agreement, the terms "Account", "Account Debtor", "Chattel Paper", "Deposit Account", "Document", "Equipment", "General Intangibles", "Instrument", "Inventory", "Investment Property", and "Letter of Credit Right" shall have the meanings assigned to such terms in Revised Article 9 of the Uniform Commercial Code as adopted in the State of Minnesota.

1(c)    As used in this Agreement, the following terms shall have the meanings indicated:

"<u>Collateral</u>" shall mean all property and rights in property now owned or hereafter at any time acquired by the Grantor in or upon which a Security Interest is granted to the Secured Party by the Grantor under this Agreement.

"<u>Security Interest</u>" shall have the meaning given such term in Section 2 hereof.

1(d)    All other terms used in this Agreement which are not specifically defined herein or the 1997 Security Agreement shall have the meaning assigned to such terms in Revised Article 9 of the Uniform Commercial Code as adopted in the State of Minnesota.

Section 2.    <u>Grant of Security Interest</u>.  As security for the payment and performance of all of the Obligations, the Grantor hereby grants to the Secured Party a security interest (the "Security Interest") in all of the Grantor's right, title, and interest in and to the following, whether now or hereafter owned, existing, arising or acquired and wherever located:

2(a)    All Accounts, including but not limited to, all Accounts arising from the operation of scheduled flights by Grantor on or after February 27, 2002, and rights under contracts related thereto.

2(b)    All Chattel Paper.

2(c)    All Deposit Accounts.

2(d)    All Documents.

2(e)    All Equipment.

2(f)    All General Intangibles.

2(g)    All Instruments.

2(h)    All Inventory.

030302                                           2

2(i)     All amounts pledged or otherwise provided to airport authorities to secure the right to conduct future operations and any other security deposits, including, but not limited to, security deposits provided to ground handlers, fuel suppliers, Delta Airlines, insurance providers, and global distribution system providers.

2(j)     All Spare Parts.

2(k)     All Cash.

2(l)     To the extent not otherwise included in the foregoing, all other rights to the payment of money, including rents and other sums payable to the Grantor under leases, rental agreements and other Chattel Paper; all books, correspondence, credit files, records, invoices, bills of lading, and other documents relating to any of the foregoing, including, without limitation, all tapes, cards, disks, computer software, computer runs, and other papers and documents in the possession or control of the Grantor or any computer bureau from time to time acting for the Grantor; all rights in, to and under all policies insuring the life of any officer, director, stockholder or employee of the Grantor, the proceeds of which are payable to the Grantor; all accessions and additions to, parts and appurtenances of, substitutions for and replacements of any of the foregoing; and all proceeds (including insurance proceeds) and products thereof.

The foregoing grant of security interest is intended to, and shall, among other things, protect, preserve and secure Bank's recovery of amounts equal to the cash collateral of the Secured Party used by the Grantor during the Grantor's bankruptcy case.

Section 3.     Existing Collateral Agreements; Other Terms.  The Existing Collateral Agreements remain in full force and effect and survive this Agreement.  Except as otherwise provided by this Agreement, the terms of the 1997 Security Agreement apply with equal force to this Agreement and the terms and provisions of the 1997 Security Agreement are incorporated herein by reference.  The Grantor reaffirms and ratifies the effect of all financing statements and other filings of record filed against it by the Secured Party.  It is the intention of the Grantor that the Secured Party shall have all of the interests, rights and remedies available to it under the 1997 Security Agreement, that such interests, rights and remedies shall apply in connection with this Agreement, and that the interests, rights and remedies granted hereunder shall be cumulative and in no way limit the rights and remedies granted in connection with the 1997 Security Agreement or the other Existing Collateral Agreements.

Section 4.     Names, Offices, Locations, Jurisdiction of Organization.  The Grantor's legal name (as set forth in its constituent documents filed with the appropriate governmental official or agency) is as set forth in the opening paragraph hereof.  The Grantor will not change its name, the location of its chief place of business and chief executive office or its corporate structure (including without limitation, its jurisdiction of organization) unless the Secured Party has been given at least 30 days prior written notice thereof and the Grantor has executed and delivered to the Secured Party such Financing Statements and other instruments required or appropriate to continue the perfection of the Security Interest.  The Grantor hereby authorizes the Secured Party to file one or more Financing Statements or continuation statements in respect thereof, and amendments thereto, relating to all or any part of the Collateral without the signature

030302                                    3

of the Grantor where permitted by law. A photocopy or other reproduction of this Agreement or any Financing Statement covering the Collateral or any part thereof shall be sufficient as a Financing Statement where permitted by law.

Section 5.    Remedies on Default. The Grantor acknowledges that it is currently in default under the Credit Agreement and at any time hereafter:

5(a)    The Secured Party may exercise and enforce any and all rights and remedies available upon default to a secured party under Revised Article 9 of the Uniform Commercial Code as adopted in the State of Minnesota.

5(b)    The Secured Party may exercise the default rights and remedies identified in the 1997 Security Agreement.

Section 6.    Limited Use of Cash Collateral. The Grantor acknowledges and agrees that it shall cease use of cash collateral of the Secured Party that constitutes proceeds of any Collateral (which term includes "Collateral" under the Existing Collateral Agreements) except to the extent attributable to or arising from the Grantor's flight operations on or after February 27, 2002; provided, however, that to the extent the Grantor collects proceeds from any account receivable from Hobbitt Travel or any Laughlin, Nevada area hotel, in existence as of February 26, 2002 and not yet collected as of the date hereof, in either case in an amount in excess of $120,000, such excess amount may not be used by the Grantor.

Section 7.    Notice to Consignees. Promptly upon entry of an order of the United States Bankruptcy Court for the District of Minnesota granting Secured Party relief from the automatic stay of Section 362 of the United States Bankruptcy Code, the Grantor shall deliver to all third parties that are consignees of consignment inventory of the Grantor (including, but not limited to, The Memphis Group) instructions to pay directly to the Secured Party all amounts payable on account of sales of consigned equipment, inventory and parts and other property of the Grantor being stored and sold by such party.

Section 8.    Additional Defaults. Any failure by the Grantor to perform hereunder shall constitute an Event of Default.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

03/05/02   TUE 14:38 FAX 6. .059796        SCA CUSTOMER SERVICE

IN WITNESS WHEREOF, the Grantor has caused this Security Agreement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

SUN COUNTRY AIRLINES, INC.

By _____

Title _____ _PRES / CEO_____

Address for Grantor:
2520 Pilot Knob Road
Mendota Heights, MN 55120

Grantor's Tax ID # 41-1431256

Address for the Secured Party:
U.S. Bank National Association
601 Second Avenue South
Minneapolis, Minnesota 55402

030302

5

EXHIBIT B

## AGREEMENT FOR SALE OF COLLATERAL

This Agreement is made this 6th day of March, 2002 between U.S. BANK NATIONAL ASSOCIATION, a national banking association (the "Bank"), and MN AIRLINES, LLC, a limited liability company organized under the laws of the State of Minnesota ("Buyer").

## RECITALS

FIRST:  The Bank had extended to Sun Country Airlines, Inc. ("Sun Country") from time to time credit facilities evidenced, in part, by a Credit Agreement dated as of April 14, 1997, as amended (the "Credit Agreement").

SECOND:  The obligations of Sun Country under the Credit Agreement (the "Indebtedness") are secured, in part, by (i) a security agreement (as amended, the "Security Agreement") dated as of April 14, 1997 which granted to the Bank a security interest in, among other things, all of Sun Country's inventory, equipment, accounts, general intangibles, spare parts, leases, the certificate of public convenience and necessity issued to Sun Country under 49 U.S.C. § 41102 (the "Operating Certificate"), and products and proceeds thereof, (ii) an Aircraft Engines Spare Parts Security Agreement dated as of April 14, 1997, as amended and supplemented, which granted to the Bank a security interest in, among other things, certain engines and parts, and (iii) a Collateral Assignment of Trademarks dated as of April 14, 1997, which granted to Bank a security interest in, among other things, certain trademarks (all of the foregoing property described in clauses (i), (ii) and (iii), the "Collateral").  The security interests in favor of U.S. Bank in Collateral (other than aircraft engines and certificated motor vehicles) were perfected by the filing of various financing statements with the Minnesota Secretary of State and the other offices listed on Exhibit A hereto.

THIRD:  In connection with the Credit Agreement, William E. La Macchia (the "Guarantor") made and delivered a Guaranty dated as of September 29, 2000 in favor of the Bank .

FOURTH:  Sun Country also has delivered to the Bank a Security Agreement dated as of March 5, 2002, pursuant to which it granted to the Bank a security interest in Collateral, including, without limitation, accounts arising from the flight operations of Sun Country from and after February 27, 2002 and proceeds thereof, to secure Sun Country's use of cash collateral of the Bank.  Buyer holds a security interest in certain Accounts, as that term is defined in the Security Agreement of even date herewith by and between Buyer and Sun Country, which interest is subordinated to the Bank's liens under the Security Agreement dated April 14, 1997 and the Security Agreement dated as of March 6, 2002 (all assets that are subject to the security interests of both Bank and Buyer being the "Shared Collateral").

FIFTH:  Sun Country has defaulted under the terms of the Credit Agreement.  As of the date hereof, Sun Country's Indebtedness under the Credit Agreement is approximately $13,964,294.56 plus accrued interest and costs and expenses allowed pursuant to the terms of the Credit Agreement.  In addition, certain letters of credit issued for the account of Sun Country remain undrawn in the approximate amount of $282,000.74.

SIXTH: The Bank wishes to sell, and Buyer wishes to buy, certain assets of Sun Country included in the Collateral described herein in a manner pursuant to the provisions of the Uniform Commercial Code as now in effect in the State of Minnesota (the "UCC") on the date on which all conditions precedent specified in Section 7 below have been satisfied (or waived by the applicable party) (the "Closing Date").

NOW, THEREFORE, in consideration of the above recitals, which the parties agree are true and correct, and the covenants and representations set forth herein and other good and valuable consideration, the parties to this Agreement agree as follows:

1.   Conveyance by the Bank. As of the Closing Date, by the Bank's execution and delivery to Buyer of this Agreement and a bill of sale at the closing of this transaction in the form of Exhibit B attached hereto (the "Bill of Sale"), and by operation of and to the extent provided by Minnesota Statute §§ 336.9-610 and 336.9-617 and as otherwise permitted by applicable law, the Bank agrees to and hereby conveys to Buyer, and Buyer agrees to and hereby purchases from the Bank, all of the respective rights and interests of Sun Country in the Collateral as described in Schedule I to the Bill of Sale (the terms of which are incorporated herein by reference thereto) (the "Purchased Assets"). Notwithstanding that certain assets may have been listed on Schedule I, Purchased Assets exclude (i) all property leased by Sun Country as lessee, (ii) all property licensed to it as licensee, (iii) any other property not owned by it, (iv) any other property not constituting Collateral and (v) certificated motor vehicles. The parties intend that the conveyance shall effect a transfer of possession and ownership of the Purchased Assets to Buyer free and clear of all liens, security interests, encumbrances and other rights and interests therein as and to the extent provided in Minnesota Statute § 336.9-617. Notwithstanding the foregoing, the transfer of Sun Country's rights and interests in the Operating Certificate to Buyer shall not occur until such time as the Department of Transportation, and any other governmental authority the consent of which is required for transfer, grant consent to such transfer. The conveyance of Sun Country's rights and interests in the Operating Certificate as provided by the first sentence of this Section 1 shall occur upon the granting of such consent, subject to the satisfaction (or waiver by the applicable party) of the conditions precedent specified in Section 7.

2.   Purchase Price. In consideration of the conveyance of the Purchased Assets by the Bank to Buyer, Buyer agrees to pay to the Bank the sum of Two Million Nine Hundred Thousand Dollars ($2,900,000) without offset (the "Purchase Price"). The Purchase Price shall be paid to the Bank in immediately available funds (which may be a cashier's check from a bank acceptable to Bank) as follows: $500,000 ("Earnest Money") by the close of business on the date of execution of this Agreement and (b) the balance of $2,400,000 (the "Purchase Price Balance") on the Closing Date. Buyer acknowledges that subject to satisfaction of the conditions precedent to its obligation to perform hereunder, it will pay the Purchase Price to Bank prior to final approval by the Department of Transportation for transfer of rights pertinent to the Operating Certificate and that Buyer shall bear all risk of any subsequent refusal of the Department of Transportation to grant such final approval.

3.   Buyer's Failure to Perform. In the event that Buyer fails to pay the Purchase Price notwithstanding satisfaction of all conditions to its performance, or this Agreement is terminated or the transaction hereunder cannot be closed and there has been a material, uncured breach by

2

the Buyer hereunder, Bank may retain the sum of $500,000 and shall have prior rights in all of the Shared Collateral to the extent of the amount owed to Bank that is secured thereby as liquidated damages for Buyer's failure to perform hereunder (the "Liquidated Damages"). Buyer and the Bank agree that after taking into account all relevant circumstances as of the date of this Agreement, the Liquidated Damages payable hereunder represent a reasonable and genuine pre-estimate of the damages which would be suffered by the Bank in the event of Buyer's breach hereunder.

4.    Refund of Earnest Money.  In the event that the transaction hereunder does not close and this Agreement is terminated, and there has been no material uncured breach by the Buyer hereunder, the Bank shall promptly remit to Buyer the Earnest Money held by it.

5.    Best Efforts.  Buyer shall use its best efforts to cause the conditions precedent in Sections 7(a) (ii) and (vi) to be satisfied.

6.    Representations and Warranties.

(a)    In order to induce Buyer to enter into this Agreement and to pay the Purchase Price for the Purchased Assets, the Bank hereby represents and warrants to Buyer as follows:

(i)    The Bank is a national banking corporation duly organized and validly existing and has all requisite power and authority to execute and deliver, and to perform all of its obligations under, this Agreement and all instruments and other documents executed and delivered by the Bank in connection herewith.

(ii)    The execution, delivery and performance of this Agreement by the Bank has been duly authorized by all necessary action and does not and will not (i) require any consent or approval of shareholders, (ii) violate any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to the Bank or any provision of the Bank's charter or by-laws, (iii) result in a breach or constitute a default under any agreement to which the Bank is a party or by which it is bound, or (iv) require approvals, licenses, exemptions from or filings or registrations with any court, executive or legislative body, governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign other than the approval of the Department of Transportation or other necessary governmental approvals with respect to the transfer of rights pertinent to the Operating Certificate.

(iii)    This Agreement constitutes a legal, valid and binding obligation of the Bank enforceable against it in accordance with its terms.

(iv)    The Bank has not heretofore sold, assigned, transferred or otherwise encumbered any or all of its right and interest in and to the Collateral.

(v)    The Purchased Assets are conveyed to Buyer "where is" and "as is" without any warranty of fitness for a particular use or warranty of any kind except as specifically set forth in this Section 6(a). **WITHOUT LIMITING**

3

THE GENERALITY OF THE FOREGOING, THE BANK SPECIFICALLY DISCLAIMS ANY WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PURCHASED ASSETS.

(vi)     The Bank's conveyance of the Purchased Assets to Buyer is intended to be one made by private sale under Minnesota Statute § 336.9-610.

(vii)     Attached hereto as <u>Exhibit C</u> are copies of the UCC search of the records of the effective financing statements naming Sun Country on file in the office of the Secretary of State for the State of Minnesota as of February 6, 2002 (the "UCC Search"). Based upon the Bank's review of the UCC Search, the Bank has a perfected, first priority security interest in the Purchased Assets to the extent that a security interest in the Purchased Assets could be perfected under the Uniform Commercial Code in effect in the State of Minnesota by and upon the filing of the Bank's financing statements.

(viii)     To the best of the Bank's knowledge and information, no stay, injunction, or order or decree of similar effect by any court or governmental entity having jurisdiction over the parties hereto is in effect prohibiting the Bank from performing hereunder other than the automatic stay of Section 362 of the United States Bankruptcy Code.

(ix)     Without limiting any other disclaimers made herein and notwithstanding any other representation or warranty of the Bank, the Bank specifically disclaims any representation or warranty with respect to (A) its ability to transfer rights pertinent to the Operating Certificate to Buyer pursuant to the UCC, (B) its rights in the Shared Collateral and (C) any express or implied warranties as specified in clause (ii) of the description of Purchased Assets on the first page of Schedule I or any assets described in clause (v) and (vi) thereof.

(x)     Upon receipt by Bank of a Surrender Agreement substantially in the form of Exhibit E hereto (the "<u>Surrender Agreement</u>") executed by Sun Country and of a written consent by the Guarantor to surrender of the Collateral, and, provided that neither Bank nor Sun Country is subject to any stay, injunction or order or decree of similar effect of any court or governmental entity having jurisdiction of the parties hereto prohibiting Bank or Sun Country from performing thereunder, Bank shall have received possession or control of the Collateral sufficient to satisfy the requirements of UCC §§ 336.9-610, 336.9-617 and other applicable provisions of UCC §§ 9-101 et. seq.

(b)     In order to induce the Bank to enter into this Agreement, Buyer hereby represents and warrants to the Bank as follows:

(i)     Buyer is a limited liability company duly organized and validly existing under the laws of the State of Minnesota and has all requisite power and authority to execute and deliver, and to perform all of its obligations under, this

4

Agreement and all instruments and other documents executed and delivered by Buyer in connection herewith.

(ii)     The execution, delivery and performance of this Agreement by the Buyer have been fully authorized by all necessary action and do not and will not (i) violate any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Buyer or any provision of Buyer's charter or by-laws, (ii) result in a breach or constitute a default under any agreement to which Buyer is a party or by which it is bound or (iii) require any authorizations, consents, approval, licenses, exemptions from or filings or registrations with any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign other than the approval of the Department of Transportation with respect to the transfer of rights pertinent to the Operating Certificate or other necessary governmental approvals with respect to the transfer of rights pertinent to the Operating Certificate.

(iii)    This Agreement constitutes the legal, valid and binding obligation of Buyer enforceable against it in accordance with its terms.

(iv)    Buyer is a sophisticated purchaser with respect to the Purchased Assets, has conducted all inspections, reviews and/or other due diligence deemed to be necessary and appropriate by Buyer with respect to the Purchased Assets, is familiar with the Purchased Assets and has made an informed and independent decision with respect to the purchase of the Purchased Assets.

(v)    Buyer is proceeding in good faith in connection with the purchase of the Purchased Assets.

(vi)    Buyer is familiar with the pending petition commencing an involuntary bankruptcy case against Sun Country and seeking entry of an order for relief.

(vii)    There are no other agreements or understandings with Bank other than as set forth herein.

7.    <u>Conditions Precedent</u>.

(a)    The obligation of Buyer hereunder to pay the Purchase Price Balance is subject to fulfillment (or waiver by Buyer) of each of the following conditions precedent:

(i)    The representations and warranties of Bank shall be true and accurate from and including the dates of execution of this Agreement to and including the closing of the transaction hereunder.

(ii)    Buyer shall have received from the Secretary of Transportation consent to provide air transportation as an air carrier pending final approval of transfer of rights pertinent to the Operating Certificate to Buyer, the terms of which consent shall be reasonably satisfactory to Buyer.

       (iii)     No stay, injunction or order or decree of similar effect of any court or governmental entity having jurisdiction of the parties hereto shall be in effect nor any statute or regulation be applicable prohibiting Buyer or Sun Country from performing hereunder.

       (iv)     Sun Country shall have executed and delivered to Bank the Surrender Agreement and Bank shall have received the written consent of the Guarantor to the surrender of the Collateral.

       (v)     Relief from stay shall have been granted by the Bankruptcy Court for the District of Minnesota pursuant to 11 U.S.C. § 362 of the United States Bankruptcy Code to permit sale of the Purchased Assets.

       (vi)     Buyer shall have entered into all of the agreements identified on <u>Exhibit D</u> hereto.

    (b)     The conveyance of the Purchased Assets and delivery of the Bill of Sale by Bank are subject to fulfillment (or waiver by Bank) of each of the following conditions precedent:

       (i)     The representations and warranties of Buyer shall be true and accurate from and including the dates of execution of this Agreement to and including the closing of the transaction hereunder.

       (ii)     No stay, injunction or order or decree of similar effect of any court or governmental entity having jurisdiction of the parties hereto shall be in effect nor any statute or regulation be applicable prohibiting Bank or Sun Country from performing hereunder.

       (iii)     Sun Country shall have executed and delivered to Bank the Surrender Agreement and Bank shall have received the written consent of the Guarantor to the surrender of the Collateral.

       (iv)     Relief from stay shall have been granted by the Bankruptcy Court for the District of Minnesota pursuant to 11 U.S.C. § 362 of the United States Bankruptcy Code to permit sale of the Purchased Assets.

       (v)     Sun Country and the Guarantor shall have consented to the sale of the Purchased Assets to Buyer.

       (vi)     Buyer shall have paid the Purchase Price to the Bank in accordance with the provisions of Section 2 above.

       (vii)     Buyer shall, on or before the date of consummation of the transfer of the Purchased Assets to Buyer, have delivered to the Bank a certificate signed by a senior officer, manager or other authorized representative of Buyer certifying (i) that the conditions specified in Section 7(a) with respect to the representations and warranties of Buyer have been satisfied and (ii) as to the incumbency of

those officers, managers or authorized representatives of Buyer authorized to execute and deliver this Agreement and related certificates and documents.

(viii)   Bank shall be satisfied that no notice of state or federal tax lien has been recorded against any of the Purchased Assets.

(ix)   Sun Country shall have executed and delivered to Buyer documents for transfer of any of the Purchased Assets as Bank may request, in the exercise of an abundance of caution or otherwise, to effectuate a transfer of Sun Country's rights and interests therein in the event and to the extent that any such transfer cannot be effectuated pursuant to Minnesota Statute Section 336.9-617 or to facilitate any transfer of title to Buyer in applicable recording offices.

(x)   Buyer shall have received from the Secretary of Transportation consent to provide air transportation as an air carrier pending final approval of transfer of rights pertinent to the Operating Certificate to Buyer.

8.   <u>Termination of Agreement</u>.  This Agreement shall terminate and shall be of no further force or effect upon the occurrence of any of the following events:

(a)   The parties mutually agree in writing to terminate this Agreement.

(b)   If the conditions precedent for closing of this transaction are not satisfied by March 25, 2002, and either party hereto notifies the other party hereto in writing of its election to terminate this Agreement, this Agreement shall terminate immediately; provided, that, if the failure of any condition constitutes a breach by one of the parties, the party breaching such condition shall have no right to terminate this Agreement.

(c)   At any time prior to the closing of this transaction, by either Buyer or the Bank, if the other party has, in any material respects, breached any material representation, warranty, covenant or undertaking contained herein and such breach has not been or cannot be cured by the earlier of (i) three (3) days after the date on which written notice of such breach is given to the party committing such breach or (ii) termination pursuant to Section 8(b).

(d)   The Bankruptcy Court for the District of Minnesota shall deny Bank's motion for relief from stay pursuant to 11 U.S.C. § 362 of the United States Bankruptcy Code which was filed on February 27, 2002.

(e)   The Department of Transportation shall deny Buyer's request for an order permitting Buyer to provide air transportation as an air carrier on a temporary basis pending final approval of transfer of rights pertinent to the Operating Certificate to Buyer or shall disapprove transfer of the Operating Certificate.

Notwithstanding any termination of this Agreement under  this Section 8, each party shall retain all rights and remedies against the other party provided by law for any material breach of this Agreement, subject to the limitations of Sections 3 and 13.

9.     Schedule of Purchased Assets.  Buyer acknowledges and agrees that the Schedule I of Purchased Assets attached to the Bill of Sale was prepared solely by Sun Country. Buyer is not relying on the Bank for verification or the accuracy of such schedule or the accuracy of the existence of such Collateral as of the date of closing of this transaction.  Buyer has made an independent inspection and valuation of such Collateral and acknowledges that since Schedule I was prepared certain portions of the Collateral identified on Schedule I may have been used in the ordinary course of Sun Country's business operations, or for reasons unknown to Bank, as of the date of closing of this transaction, may not exist or have ever existed or may have been erroneously included on Schedule I.  Buyer assumes all risk as to the existence, diminution and verifiability of such purchased Collateral or of Sun Country's non-ownership thereof and is proceeding in this purchase of its own volition and agreement without any reliance or representation by Bank of any nature as to the accuracy of such schedule and agrees and waives for itself, its successors and assigns any claim or cause of action against Bank or Sun Country regarding the schedule in any respect whatsoever.

10.     Storage of Collateral.  Buyer and Sun Country, their successors and assigns, agree that the Collateral not purchased from Bank by Buyer may be maintained on the premises occupied by Sun Country or Buyer, including, without limitation, the hangar or storage facility in which Collateral not purchased is maintained, for a period of one hundred twenty days from the date of closing of this transaction without cost, charge, or occupancy expense and each of them, for themselves, their successors and assigns, waive all such rights to payment and charges including any right to surcharge the Bank's Collateral within the meaning ascribed in 11 U.S.C. 506(c).  Notwithstanding any provision to the contrary herein, Buyer shall have no risk of loss or liability with respect to Collateral not included in the Purchased Assets except to the extent of Buyer's gross negligence or willful misconduct or if Buyer uses any such Collateral without the Bank's prior written consent.  In the event that subsequent to the closing of this transaction the Buyer purchases parts or equipment from the Bank not included in the Purchased Assets, Buyer's employees shall provide documentation and maintain records to account for any such purchase and provide the same to the Bank at no cost to the Bank.  Any such purchase shall be subject to the prior agreement of the Bank.

11.     Budget.  Buyer, Bank and Sun Country have approved a budget (the "Budget") for Sun Country operations pending consummation of this transaction.  Bank agrees to permit use of its cash collateral from operations of Sun Country (not from the sale of Collateral) to the extent contemplated by such Budget so long as the Buyer is obligated to and is continuing to advance loans to Sun Country under the terms of that certain Loan Agreement between the Buyer and Sun Country dated as of March 5, 2002 (the "Buyer Loan Agreement").  Buyer agrees to advance loans to Sun Country as contemplated by such Budget and in accordance with the terms of the Buyer Loan Agreement and to permit use of cash collateral from operations of Sun Country as contemplated by the Budget.

12.     Books and Records.

(a)     The Bank, upon the request of Buyer, will deliver to Buyer copies of those books and records in the possession of the Bank, if any, which Buyer reasonably determines relate directly to ownership and management of the Purchased Assets.

8

(b)     For a period of seven (7) years after the date of closing of this transaction (and notwithstanding the 120 period stated in Section 10, above), Buyer, to the extent it is not prevented from doing so by the Trustee, Guarantor or Trisept (as such terms are defined herein), will maintain custody of and will store all books, records and writings of Sun Country, whether obtained from Bank or from Sun Country.  Buyer will maintain such custody and storage without charge to Bank or the Guarantor for a period of two years.  Thereafter, Buyer may condition its maintenance and storage of such books, records and writings upon receipt of reasonable payment from the Bank or the Guarantor. All such books, records and writings are and will remain the property of Sun Country except for the books, records and writings which are included in the assets being sold to Buyer as described in Schedule 1 to the Bill of Sale.  Following expiration of the foregoing seven (7) year period (or two (2) year period in the event no payment is made by the Bank or the Guarantor to Buyer), Buyer may dispose of such books, records and writings, provided Buyer gives the Guarantor at least thirty (30) days prior written notice of any such disposition and, if requested by the Guarantor, delivers at the Guarantor's expense any of such books, records and/or writings as the Guarantor may request. During the period in which Buyer maintains such books, records and writings, upon reasonable notice and request by Bank, its agents or designees, or by the Guarantor, his agents or designees, or by the Trustee for Sun Country as debtor in the pending bankruptcy proceeding, as the case may be, its agents or designees ("Trustee") (all of the foregoing being collectively referred to herein as the "Requesting Parties"), Buyer, during normal business hours, shall permit any representative of the Requesting Parties to examine, copy, and make extracts from all books, records and writings of Sun Country, all without cost, surcharge or expenses to the Requesting Parties other than reasonable copy charges.  Buyer shall make its employees available to the Requesting Parties' representatives in connection with the foregoing inspections, to among other things, answer questions of such representatives and locate and copy documents as requested by such representatives.

(c)     Buyer shall also make its employees available in the Twin Cities to provide such assistance for the Requesting Parties as may be requested by any Requesting Party from time to time and which require the use of the books or records of Sun Country, (x) up to 100 hours in the aggregate for the Guarantor and Bank without cost, surcharge or expenses to the Guarantor or Bank other than reasonable copy charges and thereafter at a rate described below, and (y) without limit to the Trustee without cost, surcharge or expenses other than reasonable copy charges, as follows:

(i)     Assist as requested in responding to inquiries from or audits by or required by regulatory authorities, including preparation of responses and other required documents.

(ii)     Assist as requested in reviewing credit card chargebacks to determine their validity and handling the related processing thereof.

(iii)     Provide support and information necessary for preparing tax returns including excise tax and other refund claims.

9

(iv)    Assist as requested in performing accounting functions such as general ledger posting and monthly financial statement preparation and analyses thereof.

(v)    Assist as requested in providing information with respect to the collection of accounts receivable and deposits and other assets.

(vi)    Providing information as needed in connection with the sale of parts and equipment and other assets.

(vii)    Providing other assistance of a similar nature as may be needed by a Requesting Party.

Buyer's obligation to provide the services described in this subsection (c) shall continue following the date of closing of this transaction for two (2) years, except for the obligations of Buyer described in clause (i) hereof which shall continue following the date of closing of this transaction for seven (7) years (or two years in the event no payment is made by the Bank or Guarantor to Buyer in accordance with clause (i) hereof. Notwithstanding the foregoing, the Buyer shall only be obligated to provide the services of its employees for the assistance listed in this section (c) without cost to the Bank and Guarantor for a period not to exceed 100 hours in the aggregate, with any time over the 100 hour threshold to be paid for by the Guarantor or Bank, as the case may be, at the same hourly rate for the employee whose services are requested as the salary paid by Buyer to such employee. Furthermore, except as otherwise provided in clause (ii) above, the above referenced services to be provided by the employees of the Buyer shall be only in the nature of retrieving and compiling information; the Buyer's employees shall not be required to perform any tasks for which legal liability could be imposed on the Buyer. The Buyer will inform the Guarantor of the identities of Sun Country's current accounting personnel that the Buyer decides not to hire as soon as Buyer makes that decision. Notwithstanding the foregoing, Buyer shall be responsible for all costs associated with Department of Transportation grant funds compliance.

(d)    References in this Section 12 to "records" shall be deemed to include electronically stored records; provided, however, that Buyer shall not be obligated to maintain custody of or provide services relating to electronically stored records which Trisept Technology, LLC ("Trisept") does not allow Buyer to access.

13.    Limitation of Liability of Bank. EXCEPT WITH RESPECT TO LIABILITY ARISING OUT OF THE WILLFUL MISCONDUCT OF BANK , IN NO EVENT SHALL BANK BE LIABLE TO BUYER UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY LOST PROFITS, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES SUFFERED BY BUYER, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER OR NOT THE BUYER HAS BEEN ADVISED OF THE POSSIBILITY OF DAMAGES. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, BANK'S LIABILITY TO

BUYER FOR BREACH OF THIS AGREEMENT SHALL NOT EXCEED THE AMOUNT OF
THE PURCHASE PRICE RECEIVED BY THE BANK FROM BUYER.

14.     Notices.  Except as otherwise expressly set forth herein, any notice, payment,
demand or any other communication required or permitted to be given hereunder shall be in
writing and delivered via overnight courier, telegraphed or delivered by hand to the applicable
party or parties at the address indicated below.

| | |
|---|---|
| If to the Bank: | U.S. Bank National Association<br>Attention:  Mr. David C. Larsen<br>601 Second Avenue South<br>Minneapolis, MN  55402<br>Telecopy: (612) 973 2148 |
| With a copy to: | Dorsey & Whitney LLP<br>Attention:  Diane D. Malfeld, Esq./John Thomas, Esq.<br>50 South Sixth Street, Suite 1500<br>Minneapolis, MN  55402<br>Telecopy: (612) 340-2643<br><br>Counsel to the Bank |
| And a copy to: | Godfrey & Kahn, S.C.<br>Attention:  Peter M. Sommerhauser, Esq.<br>780 North Water Street<br>Milwaukee, WI  53202-3590<br>Telecopy: (414) 273-5198<br><br>Counsel to the Guarantor |
| If to the Buyer: | MN Airlines, LLC<br>Attention:  T. Jay Salmen<br>Kennedy & Graven, Chartered<br>470 Pillsbury Center<br>Minneapolis, MN  55402<br>Telecopy: (612) 337-9310 |
| With a copy to: | Kennedy & Graven, Chartered<br>Attention:  Bonnie Wilkins<br>470 Pillsbury Center<br>Minneapolis, MN  55402<br>Telecopy: (612) 337-9310 |

15.     Miscellaneous.

(a)     Integration. This Agreement contains the total understanding of the Bank
and Buyer with respect to the transactions identified herein, is entered into within the

11

State of Minnesota and shall be construed in accordance with the laws of the State of Minnesota.

(b)   Assignment.  This Agreement is not assignable by Buyer without the prior written consent of the Bank and may not be modified except by a writing signed by the parties hereto.

(c)   Third Party Rights.  No third party beneficiary rights are created hereunder.

(d)   No Agency or Joint Venture.  Neither the execution of this Agreement nor any action taken by the parties hereto is intended to be, nor shall it be construed to be, the formation of an agency relationship, a partnership or joint venture.  No party hereto shall have the right to obligate or otherwise bind any other party hereunder or make any representations on behalf of any other party hereto.

(e)   WAIVER OF TRIAL BY JURY.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(f)   Headings.  Section and article headings used in this Agreement have no legal significance and are used solely for convenience of reference.

(g)   Expenses.  Each party shall pay for its own legal, accounting and other similar expenses incurred in connection with the transactions contemplated by this Agreement.

(h)   Taxes.  Any sales, transfer, use or excise taxes payable in connection with the transfer of the Purchased Assets to Buyer shall be paid by Buyer.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

12

IN WITNESS WHEREOF the parties have executed this Agreement the date first above written. and agree to be bound by the terms hereof and the documents issued pursuant hereto.

U.S. BANK NATIONAL ASSOCIATION

By _____

Its _____

MN AIRLINES. LLC

By _____

Its _____

[Signature Page to Agreement for Sale of Collateral]

<u>CONSENT OF SUN COUNTRY AIRLINES, INC.</u>

The undersigned, Sun Country Airlines, Inc., hereby acknowledges the foregoing Agreement for Sale of Collateral (the "Agreement") and consents to the execution and performance by U.S. Bank National Association thereof and thereunder. The undersigned agrees to perform in accordance with those provisions of the Agreement that require performance by it, including, without limitation, the delivery of the documents of transfer contemplated by Section 7(b)(iii) and (ix). The undersigned agrees that upon consummation of the sale of the Purchased Assets (as defined in the Agreement) and receipt of payment by the Bank of the proceeds thereof, the undersigned will remain liable for its remaining obligations under the Credit Agreement and the security interests of the Bank in Collateral other than the Purchased Assets remain in full force and effect. The undersigned further acknowledges and agrees that the execution, delivery and performance by U.S. Bank National Association of the Agreement shall not impair in any respect, or give rise to any defense whatsoever to, the remaining liability of the undersigned to U.S. Bank National Association.

Dated: _3 · 6 · 0 2_                    SUN COUNTRY AIRLINES, INC.

                                        By _____

                                        Its _____Pres / CEO_____

EXHIBIT B TO
AGREEMENT FOR SALE OF COLLATERAL

## BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, U.S. BANK NATIONAL ASSOCIATION, a national banking association ("Bank"), hereby sells, assigns and transfers to MN AIRLINES, LLC, a limited liability company organized under the laws of the State of Minnesota ("Buyer"), pursuant to the terms and conditions of the Agreement for Sale of Collateral dated March __, 2002 (the "Agreement"), all of the respective rights and interests of Sun Country Airlines, Inc. ("Sun Country") in the assets described in Schedule I hereto (the "Purchased Assets).

Notwithstanding anything to the contrary set forth or implied in the foregoing paragraph or Schedule I hereof, this Bill of Sale and the Purchased Assets exclude (i) all property leased by Sun Country as lessee, (ii) all property licensed to Sun Country as licensee, (iii) any other property not owned by Sun Country and (iv) any other property not constituting Collateral (as defined in the Agreement). Notwithstanding the foregoing, the transfer to Buyer of Sun Country's rights and interests in the certificate of public convenience and necessity issued to Sun Country under 49 U.S.C. § 41102 shall not occur until such time as the Department of Transportation, and any other governmental authority the consent of which is required for transfer, grant consent to such transfer.

THE BANK SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES RELATIVE TO THE PHYSICAL CONDITION OF THE TANGIBLE ASSETS HEREBY SOLD, TRANSFERRED AND DELIVERED, IT BEING UNDERSTOOD THAT BUYER SHALL BE ACQUIRING SUCH ASSETS ON AN "AS IS" BASIS, EXCEPT AS OTHERWISE PROVIDED IN THE AGREEMENT.

This Bill of Sale is executed in accordance with the terms and conditions of the Agreement, and the terms of this Bill of Sale are subject to the terms and provisions of that Agreement.

IN WITNESS WHEREOF, the Bank has caused this Bill of Sale to be executed by a duly authorized officer as of this ___ day of March, 2002.

U.S. BANK NATIONAL ASSOCIATION

By _____
Its _____

030402

## SCHEDULE I TO BILL OF SALE

### Purchased Assets

The Purchased Assets, to the extent such assets constitute Collateral as set forth in the Agreement for Sale of Collateral, are as follows:

(i)   all intellectual property of Sun Country, including, without limitation, the "Sun Country" name and all logos, registered and unregistered trademarks, trade names and service marks related to said name, all customer lists and data bases of customer and passenger information, domain names, and telephone, telecopy and e-mail addresses and listings of Sun Country;

(ii)   the capital equipment and software listed on Attachment 1 to this Schedule, together with any express or implied warranty by the manufacturers or Sun Country of any item or component part thereof (collectively, "Capital Equipment");

(iii)   the Accounts listed on Attachment 2 to this Schedule;

(iv)   to the extent of any interest or rights of Bank in the same, the Operating Certificate, subject to necessary governmental approvals.

(v)   any and all existing and assignable manufacturer or vendor warranties, service policies, customer support agreements and similar items (or to the extent such items are not assignable, subrogation rights to such items),

(vi)   all insurance benefits, including rights and proceeds, arising from or relating to the Purchased Assets prior to the Closing,

(vii)   all proceeds and products of the foregoing,

(viii)   all books and records relating to the operations of Sun Country and the Purchased Assets, including, without limitation, records, referral sources, research and development reports and records, production reports and records, service and warranty records, equipment logs, operating guides and manuals, FAA maintenance manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records and, subject to legal requirements, but excluding financial and accounting records.

## Attachment 1 to Schedule I

List of Capital Equipment begins on following page.

## CAPITAL EQUIPMENT

### Inflight Equipment, as follows:

Wheel Chairs (2 EA) for 737s
727 Liquor & Beverage carts 16 sets
Meal Carts – 737 (22 EA)
Meal Carts – 737 (242 EA)
Carriers (167 EA)
Wheel Chairs by seatcase qty 2
Waste Bins (12 EA)

### All Telephone Equipment

### Office/Hangar Equipment, as follows:

Portable Office
New Office Above Crew RM
Maint Control Work Surface
Racks – MSP
Stores Mezzanine Addition
Portable Office at Hangar
Generator – MSP Hangar
Sound Seal Curtain Noise Encl
Shelves at Hangar – 30 EA
Storage Area – 737 Parts

### All Inventory and Equipment on N804; N805; N285SC; N284SC Aircraft not constituting accessions:

### All Computer Equipment: Hardware

### All Office Equipment

### Spare Aircraft Parts Inventory, as follows:

All 737 Rotable
All 737 Expendable
All 737 Repairable

### All Computer Software owned by Sun County and not subject to license by third party

### All Office Furniture

### Maintenance Equipment & Tools, as follows:

Shears & Brake

3

Dynometer
Adapter
Beam
Slide AS
Tensiometer
Portable Air Compress
Pallet Jack
Breather Test Kit
Oil Bowsers (6 EA)
Miller Welder
Reader Printer (5EA)
Hotsy Cleaner
2 727 towbars – MSP
Tire cart with ramps – nitro
Pneumatic Riveter & Puller
Ramp Test Set
Flash Measuring Gun
Pilot Adapters
T-49 Unit
Sling JT8D-200
Ramp Test Unit
VTO Test Set
VOR/LOC Ramp Test  Units
Axel Jacks (2 EA)
JT8 Engine Stand
Boot Strap Eq. For Hoist
Sling
Bonding Meter
15 Inch Band Saw
Weld Kit
Gage, Immersion Depth
Radio Altimeter Test Set
Wheel Dollies & cradles (4) MSP
Warehouse shelving – MSP warehouse
Malabar axle jack, model 65P10-MSP
Warehouse Shelving
PSD60-2R AC Cap FQ Tester
Fuel Tank Breathing Eq
Thermocouple T/S
5000 Watt generator-stores
NPC-200 Fuel Cart
Elevator Rig Beam Set
CR111225 Repeater – MSP Hangar
3/32 Tungsten & Welder
3 Power Riveting Kit
Hot Bonder

4

NAV-402AP NAV/COM Ramp Tester Set
Protractor
Protractor Stall Warning
Malabar axle jack    MX
ATC-601 Transponder Ramp Test Set
TBA542 Breakout Box B727 DFDR
Data Loader
Fairchild F1000
Shear-Hydraulic
Video Probe
Squibb & Fault Box Tester
GE RPK 119G01 Eng Kit
Kit Beam Engine O-Head

**All Tools and Equipment for 737 Aircraft**

**Ground Equipment, as follows:**

Hoff Tow Tractor
1991 Izusu FSR catering truck – MSP
Mobile Radio Equipment
Rapid Chargers
1994 Izusu FSR catering truck – MSP
727 Tow bar
Forklift, CAT
727 Tow bar
727 Tow bar
Forklift, Herc-U-Lift
High Lift Truck – MSP
Heaters (3 EA)
Ground power units – trilectron – MSP hangar
Scissor Lift – Mark – MSP hangar
JLG High Reach Lift (1 EA)
Scissor Lift – MSP
Mobile Fuel Tanks (2 EA)
88 Ford F600 Van Truck
737 Towbars (2 EA)
Boarding wheel chairs 2 ea
Boarding wheel chair 737 HHH
737 Towbar s/n 45226 (1 ea.)

**Kitchen Equipment–MSP, as follows:**

Package System
Hobart Dishwasher
Range & Hood

SS Tables (7 EA)
Total Refrig System
Kitchen Cooler/freezer
Dunnage Racks (50 EA)
2 Comp Sink
Sealer & Shrink Tunnel
Platform Truck
Used Oven/Boiler
Metal Tables
Refrigerator & Install
Sinks & Installation
Slide & Conveyor
Walk-in Cooler

## Other miscellaneous items as follows:

All turbo oil at hangar & line stations
All hydraulic oil at hangar & line stations
All industrial gases & chemicals at hangar & line stations
Chemstation & chemicals for cleaning located at hangar
All consumable chemicals in firesafe cabinets including cabinets at hangar
All power cords/hoses/grounding equipment at hangar & line stations
All wheel chocks in hangar and at terminal
All aircraft hardware including bins on hangar floor
All supplies such as speed tape, exacto knives, drill bits, etc. at hangar and line stations
All sheet metal stock & bins on hangar floor
All GSE hardware, oils, filters & auto parts, including cabinets in auto shop at hangar
All maintenance personnel lockers on site at hangar
All shelving and pallet racking located at hangar & warehouse
All maintenance expendable tools not specifically discussed above and located on the hangar
     floor and in the tool crib
All aircraft blankets/pillows/pillowcases/headrests/cleaning supplies/headsets located at hangar,
     terminal, warehouse & outstations
All aircraft seat covers/literature pockets & cushions for 737 aircraft & specific to 284 & 285
All shelving located at headquarters for records, if not already included in office equipment
All furniture not specifically designated on the listing
All office supplies located at hangar, headquarters, warehouse, terminal, line stations
All forms specific to Sun Country including maintenance forms, bag tags, station forms, ticket
     stock, etc.
All inflight training equipment, not included on specific asset list (including but not limited to
     Boeing door trainers, CPR manicans, AED trainers, etc.)
All inflight decanters, trays, aircraft accessories, etc. on aircraft at MSP commissary
All catering food/condiments/beverages/liquor on aircraft and at MSP commissary
All kitchen utensils, pans, etc. located at MSP commissary
All kitchen racks/sinks/tables/flatbeds/pallet jacks/ice machines located at MSP commissary
All paper supplies such as toilet paper, papertowels, soap, etc. at all locations

All technical manuals including micro-fische & hardcopy
All refrigerators, microwaves, TVs, VCRs located at hangar, headquarters, commissary, terminal
4 Maintenance stairs for 727, if not already included in 737 tooling listing
All prepaid fuel inventories

## Notes:  re location

Headquarters or Corporate means the offices located at 2520 Pilot Knob Road,
     Mendota Heights, MN 55120
Hangar means the NWA permanent hangar located at 7701 26th Avenue South,
     Minneapolis, MN 55450
Warehouse means the warehouse located at 2425 Enterprise Drive,
     Mendota Heights, MN  55120
Commissary means the kitchen located at 108 Northland Drive, Suite 204,
     Mendota Heights, MN 55120
Line stations means any station which Sun Country previously or currently flies its aircraft

**<u>Attachment 2 to Schedule 1</u>**

List of Accounts begins on following page.

"Accounts" shall mean:

1.    The following deposits, prepayments, holdbacks and receivables, without regard to the
date such accounts were funded, unless otherwise indicated:

| | |
|---|---|
| Hobbit Travel | Tour Operator/Travel Agency Receivables up to $120,000; |
| Hotels in Laughlin, Nevada; | Hotels Receivables up to $120,000; |
| Pafco | Fueler; |
| Koch | Fueler; |
| Marathon Ashland | Fueler; |
| Av Fuel | Fueler; |
| Canyon | Fueler; |
| Aero Energy | Fueler; |
| World Fuel Services | Fueler; |
| Mohave Airport Authority | Airport; |
| Seattle Airport | Airport; |
| Orlando Airport | Airport; |
| Ft Meyers Airport | Airport; |
| San Antonio Airport | Airport; |
| Denver Airport | Airport; |
| ATS | Ground Handler; |
| Evergreen | Ground Handler; |
| Integrates Services | Ground Handler; |
| Worldwide Services | Ground Handler; |
| Slattery | Ground Handler; |
| Aviation Ground Services | Ground Handler; |
| Delta | Parts Contract & Stations; |
| M&I | Visa/MasterCard holdback (post January 22, 2002 sales only); |
| Valley National Bank | Charter Escrow; |
| American Express | Credit Card Holdback; |
| ARC | Travel Agency Sales; |
| ILFC | Aircraft 804; |
| ILFC | Aircraft 805; |
| ILFC | Aircraft 801; |
| ELFC | Engine Lease; |
| Northern Lakes | Aircraft 284; |
| Northern Lakes | Aircraft 285; |
| Aviation Insurance (Hull, Liability and War Risk) | -- Refund/Credit; and |
| DOT Grant Funds | |

2.    In addition to the above, any and all of the following created or arising on or after
February 27, 2002:  Accounts Receivable, Bank Accounts, Cash,  Deposits, Escrow
Accounts, and Escrowed Funds (all as defined below).

9

## Definitions

"Accounts Receivable" shall mean the rights of the Sun Country to payment for goods sold or leased or for services rendered or to be rendered, whether or not such right has been earned by performance, all guaranties and security therefor, and all interests in the goods, insofar as the same constitute Shared Collateral, the sale or lease of which gave rise thereto, including the right to stop such goods in transit, excluding all Accounts Receivable that are proceeds of Collateral not arising from the flight operations of Sun Country on and after February 27, 2002.

"Bank Accounts" shall mean the accounts maintained in Sun Country's name at Bank.

"Cash" shall mean all cash and cash equivalents and all amounts held in or credited to the Bank Accounts that are proceeds of Accounts Receivable that are Shared Collateral and all investments of the same and all interest, profits, dividends and distributions on or other rights in connection with such property.

"Deposits" shall mean all moneys held by third parties for deposit of funds advanced by Sun Country for payment of services to be incurred, whether or not any such account is held pursuant to an agreement.

"Escrowed Funds" shall mean all deposits by charter participants paid to the Sun Country and thereafter deposited into an escrow account maintained by Sun Country with depository institutions in a manner consistent with regulations issued by the Department of Transportation.

"Escrow Account" shall mean the escrow account or accounts maintained by Sun Country to which all Escrowed Funds are credited.

Notwithstanding anything to the contrary described above, Bank is not transferring any cash or cash equivalents that do not constitute proceeds of Shared Collateral ("Bank Retained Cash"), including without limitation, Bank Retained Cash credited to Bank Accounts.

10

EXHIBIT C

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT (this "Agreement") is entered into as of the 6th day of March, 2002 by and between Sun Country Airlines, Inc., a Minnesota corporation ("Borrower"), and MN Airlines, LLC, a Minnesota limited liability company ("Lender").

### W I T N E S S E T H:

1.    On or about January 8, 2002, an involuntary case was commenced against Sun Country under chapter 7 of the Bankruptcy Code, which case was transferred to the District of Minnesota, Fourth Division (the "Court"), as Case No. 2-40303 (the "Case"). An order for relief has not been entered and Borrower continues to operate and to use, acquire and dispose of property as if the involuntary case had not been commenced pursuant to 11 U.S.C. §303(f).

2.    On or about February 27, 2002, U.S. Bank National Association, a national banking association (the "Bank"), a secured creditor of Borrower, filed with the Court a motion for an order lifting the automatic stay under 11 U.S.C. § 362(d), to permit Borrower to voluntarily surrender control or possession of the Bank's collateral (the "Bank's Collateral") to the Bank for disposition in accordance with Article 9 of the Uniform Commercial Code, Minn. Stat. Ch. 336.9 (the "UCC").

3.    Upon entry of the Order, Lender wishes to buy, and Bank wishes to sell certain assets of the Borrower included in the Bank's Collateral (the "Transferred Assets") pursuant to the UCC.

4.    Lender also requires operating certificates, permits and pending applications therefor or renewals thereof currently held by Borrower, which are subject to the approval of federal agencies such as the Department of Transportation ("DOT").

5.    It is necessary for Borrower to remain in operation on a limited basis until the transaction between Lender and the Bank is consummated (the "Gap Period").

6.    Borrower estimates that it will require up to One Million Five Hundred Thousand Dollars in loan proceeds to continue airline operations on a limited basis during the Gap Period.

7.    Lender is willing to loan to Borrower the amounts needed, up to One Million Five Hundred Thousand Dollars, to assure that the airline continues operations to a level necessary to preserve the value of the Purchased Assets during the Gap Period, provided that Borrower shall pay $208,000 of such proceeds to the Bank.

NOW, THEREFORE, in consideration of the mutual promises herein contained and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1

## DEFINITION OF TERMS

1.1   Definitions.  As used in this Agreement, all exhibits and schedules hereto and in any note, certificate, report or other Loan Documents made or delivered pursuant to this Agreement, the following terms have the respective meanings assigned to them in this Section 1 or in the section or recital referred to below:

"Advance" means the disbursement by Lender of a sum or sums lent to Borrower pursuant to this Agreement.

"Agreement" means this Credit Agreement, including the schedules and exhibits hereto, as the same may be renewed, extended, restated, or modified from time to time.

"Agreement for the Sale of Collateral" means the agreement of even date herewith by and between the Bank and Lender pertaining to the sale of the Transferred Assets from Bank to Lender.

"Aircraft" is defined in the Security Agreement.

"Bank" means U.S. Bank National Association.

"Base Rate" means the variable rate of interest established from time to time by the Bank as its prime rate of interest (which rate of interest may not be the lowest rate charged by the Bank on similar loans).  Each change in the Base Rate shall become effective without prior notice to Borrower automatically as of the opening of business on the date of such change in the Base Rate.

"Bill of Sale" means the bill of sale from the Bank conveying the Borrower's interest in the Transferred Assets to Lender pursuant to the UCC.

"Budget" shall be the initial budget relating to operation of Borrower's business prepared by Borrower and approved by Lender, and attached hereto as Exhibit A, as such may be amended from time to time pursuant to Section 6.1(b).

"Business Day" means any day other than a Saturday, Sunday or day on which national banks are authorized to be closed under the laws of the State of Minnesota.

"Certificate Authority" means final approval by the appropriate federal agencies of operating certificates and permits required to provide air transportation ("Certificate Authority").

"Collateral" is defined in Section 3.

"Commitment" means One Million Five Hundred Thousand Dollars ($1,500,000.00) as the same may be decreased by Borrower pursuant to Section 2.1, or terminated by Lender pursuant to Section 8.2.

"Debtor Laws" means all applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, receivership, insolvency, reorganization or similar laws from time to time in effect affecting the rights of creditors generally.

2

"Default Rate" is defined in Section 2.3(b) hereof.

"Dividends" in respect of any corporation, means (a) cash distributions or other distributions on, or in respect of, any class of capital stock of such corporation, except for distributions made solely in shares of stock of the same class, and (b) other payments or transfers made in respect of the redemption, repurchase or acquisition of such stock.

"Environmental Laws" means any law pertaining to air, emissions, water discharge, noise emissions, solid or liquid waste disposal, hazardous waste or materials, industrial hygiene, or other environmental, health or safety matters or conditions on, under or about real property or any portion thereof, and similar laws of any Governmental Authority having jurisdiction over real property as such laws may be amended or supplemented from time to time, and regulations promulgated and rulings issued pursuant to such laws.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations and published interpretations thereunder.

"ERISA Affiliate" means any Subsidiary or trade or business (whether or not incorporated) which is a member of a group of which Borrower is a member and which is under common control with Borrower within the meaning of Section 414 of the Tax Code.

"Event of Default" is defined in Section 8.1.

"FAA" means the United States Federal Aviation Administration or any successor thereto.

"Federal Aviation Act" means the Federal Aviation Act of 1958, as amended.

"GAAP" means those generally accepted accounting principles and practices, applied on a consistent basis, which are recognized as such by the American Institute of Certified Public Accountants acting through its Accounting Principles Board and the Financial Accounting Standards Board and/or their respective successors and which are applicable in the circumstances as of the date in question.

"Governmental Authority" means, with respect to any Person, any government (or any political subdivision or jurisdiction thereof), court, bureau, agency or other governmental authority having jurisdiction over such Person or any of its business, operations or properties.

"Hazardous Material" means any hazardous, toxic, or dangerous waste, substance or material defined as such in or for the purpose of any Environmental Law.

"Indebtedness" means, with respect to any Person, all indebtedness, obligations and liabilities of such Person, including without limitation (a) all "liabilities" which would be reflected on a balance sheet of such Person, (b) all obligations of such Person in respect of any Guaranty, letter of credit or bankers' acceptance, (c) all obligations of such Person in respect of any lease, which in conformity with GAAP, is required to be capitalized for balance sheet purposes, (d) all obligations, indebtedness and liabilities secured by any lien or any security interest on any property or assets of such Person, and (e) any obligation to redeem or repurchase any of such Person's capital stock, warrants or stock equivalents.

3

"Intercreditor Agreement" means the Intercreditor Agreement of even date herewith by and between the Bank and Lender.

"Investment" in any Person means any investment, whether by means of share purchase, loan, advance, extension of credit, capital contribution or otherwise, in or to such Person, the Guaranty of any Indebtedness of such Person, or the subordination of any claim against such Person to other Indebtedness of such Person.

"Lien" means any lien, mortgage, security interest, tax lien, pledge, encumbrance, conditional sale or title retention arrangement, or any other interest in property designed to secure the repayment of Indebtedness, whether arising by agreement or under any statute or law, or otherwise.

"Loan" means the loan made or to be made hereunder to Borrower by Lender pursuant to Section 2.1.

"Loan Documents" means this Agreement, the Note, the Security Agreement, the UCC-1 financing statement and any agreements, documents (and with respect to this Agreement, and such other agreements and documents, any renewals, extensions, amendments or supplements thereto) or certificates at any time executed or delivered pursuant to the terms of this Agreement.

"Materially Adverse Effect" means any material adverse changes in, or effect upon, (a) the validity, performance or enforceability of any Loan Documents, (b) the financial condition or business operations of Borrower, any Subsidiary or Guarantor, or (c) the ability of Borrower to fulfill its obligations under the Loan Documents.

"Note" means the Term Note executed by Borrower and delivered pursuant to the terms of this Agreement, together with any renewals, extensions or modifications thereof.

"Notice of Borrowing" is defined in Section 2.2.

"Obligation" means all present indebtedness, obligations, and liabilities and all renewals and extensions thereof, or any part thereof, now or hereafter owed to Lender by Borrower, arising pursuant to the Loan Documents, and all renewals and extensions thereof, together with all interest accruing thereon and costs, expenses and attorneys' fees incurred in the enforcement or collection thereof.

"Order" means that certain order to be entered by the Bankruptcy Court for the District of Minnesota granting to the Bank relief from the automatic stay imposed by 11 U.S.C. § 362 with respect to the Transferred Assets.

"Person" shall include an individual, corporation, joint venture, general or limited partnership, trust, unincorporated organization, or government, or any agency or political subdivision thereof.

"Plan" means an employee benefit plan or other plan maintained by Borrower or any ERISA Affiliate and which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Tax Code, as amended.

"Potential Default" means the occurrence of any event that with passage of time or giving of notice or both could become an Event of Default.

"Principal Debt" means, as of any date, the sum of the outstanding principal balance of all outstanding Advances hereunder as of such date.

"Purchased Assets" means the assets identified on Schedule 1 to the Bill of Sale excluding (i) all property leased by Borrower as lessee, (ii) all property licensed to Borrower as licensee , and (iii) any other property not owned by Borrower.

"Security Agreement" means the Security Agreement dated the date hereof between Borrower and Lender, as amended, modified, and restated from time to time.

"Security Documents" means the Security Agreement, the UCC-1 financing statement and any certificates of title relating to the Certificated Vehicles.

"Subsidiary" means any corporation of which more than fifty percent (50%) (in number of votes) of the issued and outstanding securities having ordinary voting power for the election of at least a majority of the directors is owned or controlled, directly or indirectly, by Borrower, any Subsidiary or any combination thereof.

"Tax Code" means the Internal Revenue Code of 1986, as amended, and all regulations promulgated and rulings issued, thereunder.

"Termination Date" means the earlier of (a) the date Lender's commitment to fund Advances hereunder is terminated pursuant to Section 8.2, (b) the date that Lender's commitment to fund Advances hereunder is reduced to zero pursuant to Section 2.1, (c) the closing of a sale of Borrower's business or a sale of all or substantially all of the assets of Borrower to a party other than the Bank or Lender, or (d) failure by the Court to enter the Order on or before March 11, 2002.

"Unused Commitment" means, as of any date, (a) the Commitment, minus (b) the Principal Debt.

1.2    Accounting Terms.  As used in this Agreement, and in the Note, and in any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.1, and accounting terms partly defined in Section 1.1 to the extent not defined, shall have, as of any date, the respective meanings given to them under GAAP and all references to balance sheets or other financial statements shall mean such statements, prepared in accordance with GAAP as of such date.

1.3    Rules of Construction.  When used in this Agreement: (a) "or" is not exclusive; (b) a reference to a law includes any amendment or modification to such law; (c) a reference to a Person includes its permitted successors and permitted assigns; (d) except as provided otherwise, all references to the singular shall include the plural and vice versa; (e) except as provided in this Agreement, a reference to an agreement, instrument or document shall include such agreement, instrument or document as the same may be amended, modified or supplemented from time to time in accordance with its terms and as permitted by the Loan Documents; (f) all references to Sections shall be to Sections of this Agreement, unless otherwise indicated; (g) all Exhibits to this Agreement

5

shall be incorporated into this Agreement; (h) the words "include, "includes" and "including shall be deemed to be followed by the phrase "without limitation;" and (i) except as otherwise provided herein, in the computation of time from a specified date to a later specified date, the word "from" means "from and including" and words "to" and "until" each mean "to but excluding."

## SECTION 2

## THE LOAN

2.1    The Commitment.  Subject to the terms and conditions of this Agreement, Lender agrees to extend to Borrower, from the date hereof until the Termination Date, in one or more Advances, a term loan, which shall not exceed at any one time the amount of the Commitment. Lender has no obligation to fund Advances in excess of the amount set forth in the Budget, but Lender in its sole discretion, may make additional Advances hereunder in excess of the need for Advances set forth in the Budget.  No portion of the Loans shall be repaid and then reborrowed.

2.2.    Manner of Borrowing.  Borrower shall use its best efforts to give Lender prior written notice on or before three (3) business days prior to the day an Advance is requested (a "Notice of Borrowing") of each requested Advance hereunder in form and substance acceptable to Lender; provided, however, that Lender shall use its best efforts to make Advances on shorter notice if circumstances so require.   The Notice of Borrowing shall specify the aggregate amount and requested date of such Advance, shall specify the use of the proceeds being advanced, and shall confirm that the amount of such Advance either complies with the Budget or has otherwise been consented to by Lender.  Each Advance shall be in an amount of not less than One Hundred Thousand Dollars ($100,000.00).  Provided that Borrower is not in default of this Agreement, not later than 2:00 p.m., central time, on the date specified, subject to the terms and conditions of this Agreement, Lender shall make available to Borrower, at an account specified by Borrower, the amount of such requested Advance in immediately available funds.

2.3    Notes and Note Payments.

(a)    Note.  The Advances made under Section 2.1 by Lender shall be evidenced by the Note in form and substance satisfactory to Lender executed by Borrower, which Note shall (i) be dated the date hereof, (ii) be in the maximum principal amount of One Million Five Hundred Thousand Dollars ($1,500,000.00),  (iii) be payable to the order of Lender, and (iv) bear interest in accordance with Section 2.3(b).

(b)    Interest Rate.  The unpaid Principal Debt shall bear interest from the date of advance to maturity at a rate per annum which shall from day to day be equal to the Base Rate in effect from day to day plus three percent (3%). Overdue principal and interest on the Loans shall bear interest, to the extent permitted by applicable law, at a rate per annum equal to the Base Rate in effect from day to day plus five percent (5%) ("Default Rate").

(c)    Payments.

(1)    Principal and Interest.  The unpaid Principal Debt, and all accrued but unpaid interest thereon, shall be due and payable on the earliest to occur of:  (i) five (5) days after Lender has provided notice to Borrower of the occurrence of an Event of Default; (ii) the closing on the Agreement for Sale of Collateral; (iii) termination

6

of the Commitment pursuant to <u>Section 8.2(i);</u> (iv) sale of the Purchased Assets to a party other than Lender; or (v) May 1, 2002. Interest on any unpaid and outstanding Principal Debt shall accrue from March 5, 2002, and shall be converted to Principal on the Termination Date.

(2) Intentionally omitted.

(3) Manner and Application of Payments. All payments and prepayments by Borrower on account of principal, interest, and fees hereunder shall be made in immediately available funds; provided, however, that, if the Transferred Assets have been conveyed to Lender pursuant to closing on the Agreement for the Sale of Collateral, payment of principal, interest, and fees hereunder shall be made by Borrower's delivery to Lender of a bill of sale in the form of Exhibit B hereto conveying all of Borrower's interest in the Purchased Assets to Lender and all of Borrower's interest in the Certificated Vehicles. All such payments shall be made to Lender at its attorney's office at 470 Pillsbury Center, Minneapolis, Minnesota 55402 ATTN: T. Jay Salmen, not later than 12:00 noon, central time, on the date due and funds received after that hour shall be deemed to have been received by Lender on the next following Business Day. If any payment is scheduled to become due and payable on a day which is not a Business Day, such payment shall instead become due and payable on the immediately following Business Day and interest on the principal portion of such payment shall be payable at the then applicable rate during such extension. All payments made, if any, on the Note shall be applied first to accrued interest and then to principal (in the inverse order of maturity in the case of prepayments).

(4) Computation of Interest and Fees. Interest on the Note and the fees shall be calculated on the basis of actual number of days (including the first day but excluding the last day) elapsed but computed as if each calendar year consisted of 360 days. All interest rate determinations and calculations by Lender are conclusive and binding absent manifest error.

**SECTION 3**

**<u>COLLATERAL</u>**

To secure the payment and performance by Borrower of the Obligation, Borrower shall grant to Lender a perfected Lien in certain assets of Borrower, as more particularly described in Exhibits A and B of the Security Agreement (the "Collateral"), subordinate to the liens of the Bank as set forth in the Intercreditor Agreement.

**SECTION 4**

**<u>CONDITIONS PRECEDENT</u>**

<u>All Advances.</u> The obligation of Lender to make any Advance under this Agreement shall be subject to the conditions precedent that, as of the date of such Advance and after giving effect thereto: (a) there exists no Potential Default or Event of Default, (b) the Order shall have been granted and there is no stay, injunction or order in effect of any court or governmental entity

7

prohibiting Lender from making the Advance on the terms set out herein, (c) Lender shall have received from Borrower a Notice of Borrowing dated as of the date of such Advance and all of the statements contained in such Notice of Borrowing shall be true and correct; (d) the representations and warranties contained in each of the Loan Documents shall be true in all respects as though made on the date of such Advance; (e) Lender shall have received and approved a Budget in accordance with Section 6.1(b) and in form and substance satisfactory to Lender; and (f) the amount of the requested Advance is within the Budget, or Lender has consented thereto in writing.

## SECTION 5

## REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Advances hereunder, Borrower represents and warrants to Lender that:

5.1     Organization and Good Standing. Except for the pendency of the Case, Borrower is a corporation duly organized and in good standing under the laws of the state of Minnesota, and has the corporate power and authority to own its properties and assets and to transact the business in which it is engaged

5.2     Authorization and Power. Borrower has full power and authority to execute, deliver and perform the Loan Documents to be executed by Borrower, all of which have been duly authorized by all proper and necessary corporate action.

5.3     No Conflicts or Consents.   Neither the execution and delivery of the Loan Documents, nor the consummation of any of the transactions therein contemplated, nor compliance with the terms and provisions thereof, will contravene or materially conflict with any provision of law, statute or regulation to which Borrower is subject, any judgment, license, order or permit applicable to Borrower, any indenture, loan agreement, mortgage, deed of trust, or other agreement or instrument binding on Borrower or any provision of the charter or bylaws of Borrower.   No consent, approval, authorization or order of any court, Governmental Authority, stockholder or third party is required in connection with the execution, delivery or performance by Borrower of any of the Loan Documents.

5.4     Enforceable Obligations.   The Loan Documents have been duly executed and delivered by Borrower, and are the legal and binding obligations of Borrower, enforceable in accordance with their respective terms.

5.5     No Liens. The Certificated Vehicles are free and clear of all Liens except as may be identified on the certificate of title with respect to any Certificated Vehicle.

5.6     [Intentionally deleted]

5.7     Full Disclosure. No certificate or statement delivered by Borrower to Lender in connection with this Agreement contains any untrue statement of a material fact or omits to state any material fact necessary to keep the statements contained herein or therein from being misleading.

5.8     [Intentionally deleted]

8

5.9    Use of Proceeds    The proceeds of the Loans will be used by Borrower solely for the operation of the business of Borrower in the ordinary course of business; provided, however, $208,000 of the proceeds of the Loan must be used and is hereby earmarked for repayment of a like amount of the Borrower's Indebtedness owed to the Bank. Each Notice of Borrowing shall specify how the funds to be advanced will be applied, provided the first Notice of Borrowing shall request at least $208,000 that shall be earmarked for and applied to reducing the Borrower's Indebtedness to the Bank in such amount.

5.10    Principal Office, Etc.    The principal office, chief executive office, and principal place of business of Borrower are in Minneapolis, Minnesota, and Borrower's jurisdiction of incorporation is Minnesota. Borrower maintains its principal records and books at Mendota Heights, Minnesota.

5.11    Compliance with Law.    Except to the extent noncompliance shall have no Materially Adverse Effect, Borrower is in compliance with all laws, rules, regulations, orders and decrees (including all Environmental Laws) which are applicable to Borrower, or its properties.

5.12    Intentionally Omitted.

5.13    Casualties.    Neither the business nor the properties of Borrower are affected by any environmental hazard, fire, explosion, accident, strike, or lockout, drought, storm, hail, earthquake, embargo, act of God or other casualty (whether or not covered by insurance), which could have a Materially Adverse Effect.

5.14    Licenses, Permits, etc.    Borrower has the legal right to use such valid intellectual property rights, franchises, certificates of convenience and necessity, operating rights, licenses, permits, consents, authorizations, exemptions and orders of tribunals or otherwise as are necessary or appropriate to carry on its business as now being or currently proposed to be conducted.

5.15    Representations and Warranties.    Each Notice of Borrowing shall constitute, without the necessity of specifically containing a written statement, a representation and warranty by Borrower that no Potential Default or Event of Default exists and that all representations and warranties contained in this Section 5 or in any other Loan Document are true and correct on and as of the date the requested Advance is to be made.

5.16    Survival of Representations and Warranties.    All representations and warranties by Borrower herein shall survive delivery of the Note and the making of the Loan, and any investigation at any time made by or on behalf of Lender shall not diminish Lender's right to rely thereon.

## ARTICLE 6

## AFFIRMATIVE COVENANTS

So long as Lender has any commitment to make Advances hereunder, and until payment in full of the Obligation, Borrower agrees that (unless Lender shall otherwise consent in writing):

6.1    Financial Statements, Reports and Documents.    Borrower shall deliver to Lender each of the following:

9

(a)     Monthly Statements   Monthly, by the 30th day of each month, balance sheets and statements of profit and loss for the previous month, and monthly reports summarizing in detail all accounts receivable received by or for the benefit of Borrower and other receipts and disbursements to any by Borrower for the immediately preceding month in detail and summarizing all accounts payable and shall, upon request, provide Lender access to review copies of all checks written for the immediately preceding month and shall provide Lender with any additional reports prepared for the Office of the United States Trustee.  The monthly reports shall contain line items, which can be easily reconciled with the Budget, and shall contain such other information as Lender may reasonably request from time to time;

(b)     Budgets.  Upon execution of this Agreement, and continuing on each Friday thereafter, Borrower shall deliver to Lender a budget showing Borrower's projected sources and uses of cash and its projected revenues and expenses for the immediately succeeding four (4) weeks.  Amendments to the Budget may be delivered from time to time to Lender by Borrower.  Lender shall have the right to approve said amendments and upon such approval the amended budget shall be the Budget for purposes of Section 2.1.

(c)     DOT Reports.   Simultaneously with the filing of same with the DOT, quarterly and year-end unaudited Reports of Financial and Operating Statistics for Large Certified Air Carriers (U.S. Department of Transportation Form 41 Schedule A), provided that Borrower shall not be required to provide copies of any information which the DOT permits to be withheld from public disclosure;

(d)     Other Governmental Reports.   Copies of all correspondence with any Governmental Authority, including without limitation, DOT and FAA;

(e)     Compliance Certificate.  Within seven (7) days after the end of each month hereafter, a certificate executed by the chief financial officer or chief executive officer of Borrower, stating that a review of the activities of Borrower during such month has been made under his supervision and that Borrower has performed each and every obligation and covenant contained herein and is not in default under any of the same or, if any such default shall have occurred, specifying the nature and status thereof;

(f)     Required Reports.   On a weekly basis by facsimile or e-mail, a report of the daily disbursements and a cumulative summary comparison to the Budget amounts by expense item in a form acceptable to Lender.  Further, Borrower shall provide to Lender on a weekly basis by facsimile or e-mail, a single report reflecting the daily disbursements and a cumulative summary comparison of the Budget amounts by expense item in a format similar to the Budget.  Borrower shall provide any additional reports as may be reasonably requested by Lender.  All reports required under this paragraph shall be due by 5:00 p.m. Central Time on the Tuesday of each following week;

(g)     Other Information.   Borrower shall promptly after execution of this Agreement provide to Lender reports of estimated accrued but unpaid obligations arising after January 8, 2002.  Borrower shall deliver to Lender such other information concerning the business, properties, or financial condition of Borrower as Lender shall reasonably request including copies of all reports made to the Court, all reports of revenue and expenses, and all other reports or financial data given by Debtor to any other party, audit reports,

registration statements or other reports or notices provided to shareholders of Borrower or filed with the Securities and Exchange Commission.

6.2   Payment of Taxes and Other Indebtedness.   Borrower shall notify Lender of, and shall pay and discharge in accordance with the Budget (a) taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any property belonging to it, (b) lawful claims (including claims for labor, materials and supplies), which, if unpaid, might give rise to a Lien upon any of its property, and (c) administrative claims in the Case; provided, however, that Borrower shall not be required to pay any such tax, assessment, charge or levy if and so long as the amount, applicability or validity thereof shall currently be contested in good faith by appropriate proceedings and appropriate accruals and cash reserves therefor have been established in accordance with GAAP.

6.3   Maintenance of Existence and Rights; Conduct of Business.   Borrower shall preserve and maintain its corporate existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business, and conduct its business in an orderly and efficient manner consistent with good business practices and in accordance with all valid regulations and orders of any Governmental Authority.

6.4   Notice of Default.   Borrower shall furnish to Lender, immediately upon becoming aware of the existence of any condition or event which constitutes a Potential Default or an Event of Default, written notice specifying the nature and period of existence thereof and the action which Borrower is taking or proposes to take with respect thereto.

6.5   [Intentionally deleted]

6.6   Operations and Properties.   Borrower shall (a) act prudently and in accordance with customary industry standards in managing and operating its assets and properties and (b) keep in good working order and condition, ordinary wear and tear excepted, all of its assets and properties which are necessary to the conduct of its business.

6.7   Books and Records; Access.   Borrower shall give any representative of Lender access during all business hours to, and permit such representative to examine, copy or make excerpts from, any and all books, records and documents in the possession of Borrower and relating to its affairs, and to inspect any of the properties of Borrower.   Borrower shall maintain complete and accurate books and records of its transactions in accordance with good accounting practices; provided, however, that certain accounting records and documents pertaining to Borrower's operations from November 2001 to the date of this Agreement may not be available until thirty days hereafter.

6.8   Compliance with Law.   Borrower shall comply with all applicable laws, rules, regulations, and all orders of any Governmental Authority, a breach of which could have a Materially Adverse Effect.

6.9   Insurance.   Borrower shall keep all insurable property adequately insured at all times in such amounts and against such risks as are customary for Persons in similar businesses operating in the same vicinity.

6.10.   Authorizations and Approvals.   Borrower shall promptly obtain, from time to time at its own expense, all such governmental licenses, authorizations, consents, permits and approvals as

may be required to enable it to comply with its obligations hereunder and under the other Loan Documents.

6.11   Further Assurances.   Borrower shall make, execute and deliver or file or cause the same to be done, all such notices, additional agreements, mortgages, assignments, financing statements or other assurances, and take any and all such other action, as Lender may, from time to time, deem reasonably necessary or proper in connection with any of the Loan Documents or the obligations of Borrower thereunder.

6.12   Certified Air Carrier.   Borrower shall continue to be a certificated air carrier authorized to engage in chartered and scheduled air transportation under the Federal Aviation Act and hold a certificate of public convenience and necessity under Section 401 of the Federal Aviation Act.

6.13   Indemnity by Borrower.   Borrower shall indemnify, defend and hold harmless Lender and its directors, officers, agents, attorneys, and employees (individually, an "Indemnitee" and collectively, the "Indemnitees") from and against any and all loss, liability, obligation, damage, penalty, judgment, claim, deficiency and expense (including interest, penalties, attorneys' fees and amounts paid in settlement) to which the Indemnitees may become subject arising out of this Agreement and the other Loan Documents other than those which arise by reason of the gross negligence or willful misconduct of Lender, BUT SPECIFICALLY INCLUDING ANY LOSS, LIABILITY, OBLIGATION, DAMAGE, PENALTY, JUDGMENT, CLAIM, DEFICIENCY OR EXPENSE ARISING OUT OF THE SOLE OR CONCURRENT NEGLIGENCE OF LENDER. Borrower shall also indemnify, protect and hold each Indemnitee harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, proceedings, costs, expenses (including without limitation all reasonable attorneys' fees and legal expenses whether or not suit is brought), and disbursements of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against such Indemnitee, with respect to or as a direct or indirect result of the violation by Borrower of any Environmental Law; or with respect to or as a direct or indirect result of Borrower's use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a Hazardous Material on, under, from or about real property.  The provisions of and undertakings and indemnifications set forth in this Section 6.12 shall survive (a) the satisfaction and payment of the Obligation in termination of this Agreement and (b) the release of any Liens held by Lender on real property or the extinguishment of such Liens by foreclosure or action in lieu thereof.

6.14.   Cooperation in Effecting Transfers.   Borrower shall use its best efforts to assist Lender in obtaining the Certificate Authority and shall reasonably cooperate with Lender with respect to Lender's purchase of the Transferred Assets pursuant to the Agreement for the Sale of Collateral.

## ARTICLE 7

## NEGATIVE COVENANTS

So long as Lender has any commitment to make Advances hereunder, and until payment in full of the Obligation, Borrower agrees that (unless Lender shall otherwise consent in writing):

7.1     Limitation on Indebtedness.  Borrower shall not incur, guarantee or otherwise be or become, directly or indirectly, liable in respect of any Indebtedness, except (a) Indebtedness arising out of this Agreement, (b) current liabilities for taxes and assessments incurred in the ordinary course of business, (c) Indebtedness in respect of current accounts payable or accrued liabilities (other than for borrowed funds or purchase money obligations) incurred in the ordinary course of business, provided that all such liabilities, accounts and claims shall be promptly paid and discharged when due or in conformity with customary trade terms, and (d) Indebtedness existing on the Petition Date.

7.2     Negative Pledge.  Borrower shall not create, incur, permit or suffer to exist any Lien upon any of its property or assets, now owned or hereafter acquired, except for liens in favor of the Bank and now-existing Liens.

7.3     Negative Pledge Agreements.   Borrower shall not enter into any agreement (excluding this Agreement or any other Loan Documents) prohibiting the creation or assumption of any Lien upon any of its property, revenues or assets, whether now owned or hereafter acquired, or the ability of any Subsidiary to make any payments, directly or indirectly, to Borrower by way of Dividends, advances, repayments of loans, repayments of expenses, accruals or otherwise, except for such agreements executed by the Bank prior to the date hereof.

7.4     Limitation on Investments.   Borrower shall not make or have outstanding any Investments in any Person.

7.5     Executive Personnel.  Borrower shall not substantially change its present executive management.

7.6     Limitation on Sale of Properties.  Borrower shall not (a) sell, assign, exchange, lease or otherwise dispose of any of the Purchased Assets or the Collateral, whether now owned or hereafter acquired, except for incidental items sold in the ordinary course of providing airline services or through a surrender of collateral to the Bank in accordance with the Order, or  (b) sell, assign or discount any accounts receivable. Borrower shall not terminate material leases without consulting with Lender.

7.7     Acquisitions; Subsidiaries.  Borrower shall not (a) form, incorporate, acquire or make any Investment in any Subsidiary or (b) acquire all or substantially all of the assets, capital stock, or other securities of any class of any other Person.

7.8     Liquidation, Mergers, Consolidations and Dispositions of Substantial Assets. Borrower shall not, dissolve or liquidate, or become a party to any merger or consolidation, or acquire by purchase, lease or otherwise all or substantially all of the assets or capital stock of any Person.

7.9     Lines of Business; Receivables Policy.  Subject to Section 6.12, Borrower shall not directly or indirectly, engage in any business other than those in which it is presently engaged, namely the provision of chartered and scheduled air transportation, or discontinue any of its material existing lines of business.  Borrower shall not make any material change in its credit and collection policy, which change would materially impair the collectibility of its receivables, or rescind, cancel or modify any receivable, except in the ordinary course of business.  Borrower shall not engage in any transaction outside the ordinary course of business.

13

7.10   <u>Guaranties</u>.  Borrower shall not become or be liable in respect of any Guaranty.

7.11   <u>Sale and Leaseback</u>.  Borrower shall not enter into any arrangement with any Person pursuant to which Borrower will lease, as lessee, any property which it owned as of the date hereof and which it sold, transferred or otherwise disposed of to such other Person.

7.12   <u>Intentionally omitted</u>.

7.13   <u>ERISA</u>. Borrower shall not create any ERISA Plan.

7.14   <u>Fiscal Year</u>.  Borrower shall not change its fiscal year or method of accounting unless required to do so to conform to a change in GAAP.

7.15   <u>Territorial Restrictions on Use of Aircraft</u>.  Except in the case of an airborne emergency, Borrower agrees not to operate or locate any Aircraft, or suffer any Aircraft to be operated or located (i) in any country that is not a party to the Geneva Convention on the Internal Recognition of Rights in Aircraft (other than the United States of America); (ii) in any area excluded from coverage by any insurance required by the terms of <u>Section 6.9</u>, or (iii) in any recognized or, in Borrower's reasonable judgment, threatened area of hostilities unless covered by comprehensive war risk insurance acceptable to Lender in its sole discretion maintained at Borrower's expense and issued by underwriters acceptable to Lender; or (iv) in any country that is listed in groups Q, S, Y and/or Z in 15 CFR Part 770 Supp. 1.

7.16   <u>Possession</u>.  Except for the delivery of any Airframe or any Engine to any maintenance provider, Borrower shall not, without the prior written consent of Lender, sublease or otherwise in any manner deliver, transfer or relinquish possession of any Airframe or any Engine or install any Engine, or permit any Engine to be installed, on any other Airframe.  Neither Lender nor Borrower has or shall identify any Aircraft as being available for use in the Civil Reserve Air Fleet Program of the United States.

7.17   <u>Budget</u>.  Borrower shall not permit a negative variance of greater than ten percent (10%) per week from the aggregate of all disbursements identified in the Budget.

## ARTICLE 8

## EVENTS OF DEFAULT

8.1   <u>Events of Default</u>.  An "Event of Default" shall exist if any one or more of the following events (herein collectively called "Events of Default") shall occur and be continuing:

(a)   Borrower shall fail to pay when due the Obligation or any part thereof; or

(b)   Any representation or warranty made under this Agreement, or any of the other Loan Documents, shall prove to be untrue or inaccurate in any material respect as of the date on which such representation or warranty is made or deemed to have been made; or

(c)   Default shall occur and shall continue for five (5) days in the performance of any of the covenants or agreements of Borrower contained herein, or in any of the other Loan Documents; or

14

(d)     Any of the Loan Documents shall cease to be legal, valid and binding agreements enforceable against Borrower in accordance with its terms, shall be terminated, become or be declared ineffective or inoperative, or cease to provide the respective liens, security interests, rights, titles, interests, remedies, powers or privileges intended to be provided thereby; or Borrower shall deny that Borrower has any further liability or obligation under any of the Loan Documents; or

(e)     Any Lien on the Collateral in favor of Lender shall, after it is perfected, cease to be a valid and perfected Lien; or

(f)     Borrower suspends for two (2) or more consecutive days all or substantially all of its airline operations; or

(g)     Borrower shall file a motion with the Court seeking approval of any sale of any Collateral or other assets of Borrower pursuant to Section 363 of the Bankruptcy Code, unless such motion has been approved by Lender.

8.2     Remedies Upon Event of Default.  If any Event of Default shall occur Lender may, subject to the Intercreditor Agreement, without notice, exercise any one or more of the following rights and remedies, and any other remedies provided in any of the Loan Documents, as Lender in its sole discretion may deem necessary or appropriate: (i) terminate Lender's Commitment to lend hereunder, (ii) declare the Obligation or any part thereof to be forthwith due and payable, whereupon the same shall forthwith become due and payable without presentment, demand, protest, notice of default, notice of acceleration or of intention to accelerate or other notice of any kind, all of which Borrower hereby expressly waives, anything contained herein or in the Note to the contrary notwithstanding, (iii) subject to applicable bankruptcy law, reduce any claim to judgment, (iv) subject to applicable bankruptcy law, without notice of default or demand, pursue and enforce any of Lender's rights and remedies under the Loan Documents, or otherwise provided under or pursuant to any applicable law or agreement.

8.3     Performance by Lender.  Should Borrower fail to perform any covenant, duty or agreement contained in any of the Loan Documents, Lender may perform or attempt to perform such covenant, duty or agreement on behalf of Borrower.  In such event, Borrower shall, at the request of Lender, promptly pay any amount expended by Lender in such performance or attempted performance to Lender at its principal office in Bloomington, Minnesota, together with interest thereon at the Default Rate from the date of such expenditure until paid.  Notwithstanding the foregoing, it is expressly understood that Lender shall not assume any liability or responsibility for the performance of any duties of Borrower hereunder or under any of the Loan Documents and none of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the management and affairs of Borrower.

## ARTICLE 9

## MISCELLANEOUS

9.1     Accounting Reports.  All financial reports or projections, furnished by any Person to Lender pursuant to this Agreement shall be prepared in such form and such detail as shall be satisfactory to Lender, shall be prepared on the same basis as those prepared by such Person in prior

years and, where applicable, shall be the same financial reports and projections as those furnished to such Person's officers and directors.

9.2    Waiver.  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.  The rights of Lender under the Loan Documents shall be in addition to all other rights provided by law.  No modification or waiver of any provision of any Loan Document, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

9.3    Payment of Expenses.  Borrower agrees to pay Lender on demand all costs and expenses of Lender (including, without limitation, the reasonable attorneys' fees of Lender's counsel) incurred in connection with the preservation and enforcement of Lender's rights under the Loan Documents, and all reasonable costs and expenses of Lender (including without limitation the reasonable fees and expenses of Lender's counsel) in connection with the negotiation, preparation, execution, delivery and administration of the Loan Documents.

9.4    Notices.  Any communications required or permitted to be given by any of the Loan Documents must be (a) in writing and personally delivered or mailed by prepaid certified or registered mail, or (b) made by facsimile transmission delivered or transmitted, to the party to whom such notice of communication is directed, to the address of such party shown opposite its name on the signature pages hereof.  Any such communication shall be deemed to have been given (whether actually received or not) on the day it is personally delivered or, if transmitted by facsimile transmission, on the day that such communication is transmitted as aforesaid subject to telephone confirmation of receipt; provided, however, that any notice received by Lender after 10:00 a.m., central time, on any day from Borrower pursuant to Section 2.2 (with respect to a Notice of Borrowing) shall be deemed for the purposes of such Section to have been given by Borrower on the next succeeding day, or if mailed, on the third day after it is marked as aforesaid.  Any party may change its address for purposes of this Agreement by giving notice of such change to the other parties pursuant to this Section 9.4.

9.5    Governing Law.  This Agreement has been prepared, is being executed and delivered, and is intended to be performed in the State of Minnesota and the substantive laws of such state and the applicable federal laws of the United States of America shall govern the validity, construction, enforcement and interpretation of this Agreement and all of the other Loan Documents.

9.6    Choice of Forum; Consent to Service of Process and Jurisdiction.  Any suit, action or proceeding against Borrower with respect to this Agreement, the Note or any judgment entered by any court in respect thereof shall be brought in the Court.  Borrower hereby irrevocably consents to the service of process in any suit, action or proceeding in said court by the mailing thereof by Lender by registered or certified mail, postage prepaid, to Borrower's address shown opposite its name on the signature pages hereof.  Nothing herein or in any of the other Loan Documents shall affect the right of Lender to serve process in any other manner permitted by law or shall limit the right of Lender to bring any action or proceeding against Borrower or with respect to any of its property in courts in other jurisdiction.  Borrower hereby irrevocably waives any objections which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any Note brought in the Court and hereby further irrevocably waives any claim that

16

any such suit, action or proceeding brought in any such court has been brought in any inconvenient forum. Any action or proceeding by Borrower against Lender shall be brought only in the Court.

9.7    Invalid Provisions.    Any provision of any Loan Document held by a court of competent jurisdiction to be illegal, invalid or unenforceable and shall not invalidate the remaining provisions of such Loan Document, which shall remain in full force and the effect thereof, shall be confined to the provision held invalid or illegal.

9.8    Nonliability of Lender.    The relationship between Borrower and Lender is, and shall at all times remain, solely that of Borrower and Lender and Lender has no fiduciary or other special relationship with Borrower.

9.9    Offset.    Borrower hereby grants to Lender the right of offset, to secure repayment of the Obligation, upon any and all moneys, securities or other property of Borrower and the proceeds therefrom, now or hereafter held or received by or in transit to Lender or its agents, from or for the account of Borrower, whether for safe keeping, custody, pledge, transmission, collection or otherwise, and also upon any and all deposits (general or special) and credits of Borrower, and any and all claims of Borrower against Lender at any time existing.

9.10    Successors and Assigns.    The Loan Documents shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors, assigns and legal representatives; provided, however, that Borrower may not, without the prior written consent of Lender, assign any rights, powers, duties or obligations thereunder. Lender reserves the right to sell all or a portion of its interest in the Loan and Lender shall have the right to disclose any information in its possession regarding Borrower or any assets pledged to Lender in connection herewith to any potential transferee of the Loans or any part thereof.

9.11    Headings.    Section headings are for convenience of reference only and shall in no way affect the interpretation of this Agreement.

9.12    Survival.    All representations and warranties made by Borrower herein shall survive delivery of the Note and the making of the Loan.

9.13    No Third Party Beneficiary.    The parties do not intend the benefits of this Agreement to inure to any third party, nor shall any Loan Document or any course of conduct by any party hereto be construed to make or render Lender or any of its officers, directors, agents or employees liable (a) to any materialman, supplier, contractor, subcontractor, purchaser or lessee of any property owned by Borrower, or (b) for debts or claims accruing to any such Persons against Borrower.

9.14    Waiver of Jury Trial.    To the fullest extent permitted by applicable law, Borrower hereby irrevocably and expressly waives all right to a trial by jury in any action, proceeding, or counterclaim (whether based upon contract, tort, or otherwise) arising out of or relating to any of the Loan Documents or the transactions contemplated thereby or the actions of Lender in the negotiation, administration, or enforcement thereof.

9.15    Multiple Counterparts.    This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.

9.16   <u>Entirety</u>.   THIS AGREEMENT, THE NOTE, AND THE OTHER LOAN DOCUMENTS REFERRED TO HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO. THE PROVISIONS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH BORROWER IS A PARTY MAY BE AMENDED OR WAIVED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY THE PARTIES HERETO.

[Remainder of Page Intentionally Blank; Signature Page Follows.]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

**Address for Notice:**                             BORROWER:
2520 Pilot Knob Road
Mendota Heights, Minnesota  55120          SUN COUNTRY AIRLINES, INC.,
Attn: _____
Fax:  _____              By: _____
                                               Name: _____
                                               Title: _____


**Address for Notice:**                             LENDER:
Kennedy & Graven, Ch.                        MN AIRLINES, LLC
470 Pillsbury Center
Minneapolis MN 55402
Attn:   T. Jay Salmen                         By: _____
Fax:    (612) 337-9310                            Name: Robert E. Daly
                                               Title:  Chairman of the Board


Signature page to CREDIT AGREEMENT by and between Sun Country Airlines, Inc., a Minnesota
corporation and MN Airlines, LLC, a Minnesota limited liability company

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

Address for Notice

_____
_____
Attn: _____
Fax: _____

BORROWER:

SUN COUNTRY AIRLINES, INC.,

By: _____
Name: _____
Title: _____


Address for Notice

_____
_____
Attn: _____
Fax: _____

LENDER:
MN AIRLINES, LLC

By: _____
Name: _____
Title: _____

Signature page to CREDIT AGREEMENT by and between Sun Country Airlines, Inc., a Minnesota corporation and MN Airlines, LLC, a Minnesota limited liability company

BLW:210365v2
MN405-1

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

Address for Notice

_____
_____
Attn: _____
Fax: _____

BORROWER:

SUN COUNTRY AIRLINES, INC.,

By: _____
    Name: _____
    Title: _____

Address for Notice

_____
_____
Attn: _____
Fax: _____

LENDER:
MN AIRLINES, LLC

By: _____
    Name: _____
    Title: _____

Signature page to CREDIT AGREEMENT by and between Sun Country Airlines, Inc., a Minnesota corporation and MN Airlines, LLC, a Minnesota limited liability company

BLW-210365v2
MN405-1

CONSENT OF U. S. BANK NATIONAL ASSOCIATION

U. S. Bank National Association, a national banking association, holding a security interest in certain property pledged herein, hereby consents to Borrower's execution and delivery of the foregoing Agreement to MN Airlines, LLC, provided that U.S. Bank National Association receives the financial statements and reports to be delivered pursuant to 6.1(a), (b) and (f) of the Agreement. U.S. Bank National Association also approves the Budget attached hereto as Exhibit A.

U. S. BANK NATIONAL ASSOCIATION

By _____

Its _____

# EXHIBIT A

# BUDGET

Near Term Cash

**AMOUNTS ARE ESTIMATES - ALSO TIMING IS DIFFICULT TO PREDICT**
Dollar amounts in thousands
Source (Use) of cash

| | Operations and Administration | DIP Loan Advances | Sales Of Assets Pledged to USB | Cash Balance | Advances to Old SCA | Balance Outstanding | Cash Balance | Difference From Forecast Balance | |
|---|---|---|---|---|---|---|---|---|---|
| 2/22/2002 | | | | 432 | | | 432 | 0 | |
| 2/25/2002 | (4) | 0 | | 428 | | 0 | | | Flex Medical Funding |
| 2/25/2002 | (10) | 0 | | 418 | | 0 | | | Misc. Bills |
| 2/26/2002 | 10 | 0 | | 428 | | 0 | | | Misc. Deposit |
| 2/26/2002 | 69 | 0 | | 497 | | 0 | | | Hobbit Payments |
| 2/26/2002 | 48 | 0 | | 545 | | 0 | | | Riverside Payment |
| 2/26/2002 | (65) | 0 | | 480 | | 0 | | | Fuel (no MSP) |
| 2/26/2002 | (4) | 0 | | 476 | | 0 | | | Navtech |
| 2/26/2002 | (38) | 0 | | 438 | | 0 | | | Ground Handling-Advance Payment MSP |
| 2/26/2002 | (6) | 0 | | 432 | | 0 | | | Ground Handling-Advance Payment-Other stations |
| 2/26/2002 | (59) | 0 | | 373 | | 0 | | | Contractor Payments |
| 2/27/2002 | 0 | 0 | | 373 | | 0 | | | Airport Prepayment-LAS |
| 2/27/2002 | (42) | 0 | | 331 | | 0 | | | Delta advance payment |
| 2/27/2002 | (10) | 0 | | 321 | | 0 | | | Airport Prepayment/SJC |
| 2/27/2002 | (22) | 0 | | 299 | | 0 | | | Misc Expenses |
| 2/28/2002 | (38) | 0 | | 261 | | 0 | | | Airport Prepayment/SEA |
| 2/28/2002 | (15) | 0 | | 246 | | 0 | | | Misc Expenses |
| 2/28/2002 | (3) | 0 | | 243 | | 0 | | | Airport Prepayment/RSW |
| 3/1/2002 | (67) | 0 | | 176 | | 0 | | | Airport Prepayment/MCO |
| 3/1/2002 | (19) | 0 | | 157 | | 0 | | | Airport Prepayment/DEN |
| 3/1/2002 | (12) | 0 | | 145 | | 0 | | | Ground Handling-Advance Payment: IFP |
| 3/1/2002 | (100) | 0 | | 45 | | 0 | | | ILFC |
| 3/1/2002 | (2) | 0 | | 43 | | 0 | | | Bank fees |
| 3/1/2002 | (6) | 0 | | 37 | | 0 | | | Misc. Bills |
| 3/4/2002 | | | 257 | 294 | | 0 | | | Tax Refund |
| 3/4/2002 | 8 | 0 | | 302 | | 0 | | | Misc. Deposit |
| 3/4/2002 | 0 | 0 | | 302 | | 0 | | | Credit Card Cash- $47 held |
| 3/5/2002 | (70) | 0 | | 232 | | 0 | | | Contractor Payments |
| 3/5/2002 | (15) | 0 | | 217 | | 0 | | | Ft Meyers ground handling prepayment |
| 3/5/2002 | (50) | 0 | | 167 | | 0 | | | Misc. Bills |
| 3/5/2002 | 20 | 0 | | 187 | | 0 | | | ARC Receipt |
| 3/5/2002 | (25) | 0 | | 162 | | 0 | | | Security Fee |
| 3/5/2002 | (138) | 0 | | 24 | | 0 | | | Est Payroll including Flight & Taxes(Feb 16-28) |
| 3/5/2002 | 0 | 0 | | 24 | | 0 | | | Credit Card Cash- $47 held |
| 3/6/2002 | 0 | 0 | | 24 | | 0 | | | Credit Card Cash- $141 held |
| 3/6/2002 | 29 | 0 | | 53 | | 0 | | | Other Revenues |
| 3/6/2002 | (50) | 0 | | 3 | | 0 | | | Misc. Bills |
| 3/7/2002 | 84 | 0 | | 87 | | 0 | | | ARC Receipt |
| 3/7/2002 | (88) | 0 | | (1) | | 0 | | | ELFC Engine leasecure |
| 3/7/2002 | (220) | 0 | | (221) | | 0 | | | Other Expenses |

Near Term Cash

**AMOUNTS ARE ESTIMATES - ALSO TIMING IS DIFFICULT TO PREDICT**
Dollar amounts in thousands
Source (Use) of cash

| | Cash Activity | | Forecast Transactions and Balances | | | Actual Cash Balance | | | |
| | Operations and Administration | DiP Loan Advances | Sales Of Assets Pledged to USB | Cash Balance | Advances to Old SCA | DIP Loan Balance Outstanding | Cash Balance | Difference From Forecast Balance | Description |
|---|---|---|---|---|---|---|---|---|---|
| 3/7/2002 | 0 | 0 | | (221) | | | | | Credit Card Cash- $47 held |
| 3/7/2002 | (89) | 0 | | (310) | | | | | Tax Escrow |
| 3/7/2002 | (25) | 0 | | (335) | | | | | Boeing Deposit |
| 3/7/2002 | 413 | 0 | | 78 | | | | | Riverside & Hobbit |
| 3/7/2002 | | 0 | | 78 | | | | | |
| 3/8/2002 | (70) | 0 | | 8 | | | | | Ground Handling(Advance Payment on 60 departures @ 1900 per departure) |
| 3/8/2002 | (125) | 0 | | (117) | | | | | Fuel |
| 3/8/2002 | 0 | 0 | | (117) | | | | | Credit Card Cash- $47 held |
| 3/8/2002 | (32) | 0 | | (149) | | | | | Reserves |
| 3/8/2002 | | 0 | (257) | (406) | | | | | Payment of tax funds |
| 3/8/2002 | (50) | 0 | | (456) | | | | | Worldfuel Paiment |
| 3/8/2002 | (200) | 0 | | (656) | | | | | Delta (Ground Handling & Parts) Deposit - amount and timing subject to change |
| 3/8/2002 | | 656 | | 0 | 656 | 656 | | | |
| 3/8/2002 | | | | 0 | | 656 | | | |
| 3/11/2002 | (750) | 0 | | (750) | | 656 | | | **Estimated Aviation Insurance payment - amount and timing subject to change** |
| 3/11/2002 | 0 | 0 | | (750) | | 656 | | | Credit Card Cash-$47 held |
| 3/11/2002 | (94) | 0 | | (844) | | 656 | | | 1/2 of MSP airportcure |
| 3/11/2002 | | 844 | | 0 | 844 | 1,500 | | | |
| 3/12/2002 | (70) | 0 | | (70) | | 1,500 | | | Contractor Payments |
| 3/12/2002 | (50) | 0 | | (120) | | 1,500 | | | Amex Credit card reimbursement |
| 3/12/2002 | (50) | 0 | | (170) | | 1,500 | | | Airport Deposit or O Bond-PHX |
| 3/12/2002 | 24 | 0 | | (146) | | 1,500 | | | Credit Card Cash- $23 held |
| 3/12/2002 | | 0 | | (146) | | 1,500 | | | |
| 3/12/2002 | 141 | 0 | | (5) | | 1,500 | | | Credit Card Cash |
| 3/13/2002 | 29 | 0 | | 24 | | 1,500 | | | Other Revenues |
| 3/13/2002 | | 0 | | 24 | | 1,500 | | | |
| 3/14/2002 | 413 | 0 | | 437 | | 1,500 | | | Riverside & Hobbit |
| 3/14/2002 | 84 | 0 | | 521 | | 1,500 | | | ARC Receipt |
| 3/14/2002 | 47 | 0 | | 568 | | 1,500 | | | Credit Card Cash |
| 3/14/2002 | (89) | 0 | | 479 | | 1,500 | | | Tax Escrow |
| 3/14/2002 | | 0 | | 479 | | 1,500 | | | |
| 3/15/2002 | (220) | 0 | | 259 | | 1,500 | | | Misc. Bills |
| 3/15/2002 | (70) | 0 | | 189 | | 1,500 | | | Ground Handling(Advance Payment on 60 departures @ 1900 per departure) |
| 3/15/2002 | (125) | 0 | | 64 | | 1,500 | | | Fuel |
| 3/15/2002 | | 0 | 0 | 64 | | 1,500 | | | Parts sales from Memphis Group- to US Bank |
| 3/15/2002 | 47 | 0 | | 111 | | 1,500 | | | Credit Card Cash |
| 3/15/2002 | (66) | 0 | | 45 | | 1,500 | | | Mendota Office Core |
| 3/15/2002 | | 0 | | 45 | | 1,500 | | | |
| 3/18/2002 | (300) | 0 | | (255) | | 1,500 | | | Est Payroll including Flight, & Insurance reimbursement/Taxes (Mar 1-16) |
| 3/18/2002 | | 255 | | 0 | 255 | 1,755 | | | |
| 3/19/2002 | 47 | 0 | | 47 | | 1,755 | | | Credit Card Cash |
| 3/19/2002 | (70) | 0 | | (23) | | 1,755 | | | Contractor Payments |
| 3/19/2002 | (228) | 0 | | (251) | | 1,755 | | | Aircraft Rent |
| 3/19/2002 | 47 | 0 | | (204) | | 1,755 | | | Credit Card Cash |

Near Term Cash

AMOUNTS ARE ESTIMATES - ALSO TIMING IS DIFFICULT TO PREDICT
Dollar amounts in thousands
Source (Use) of cash

Forecast Transactions and Balances

| Date | Operations and Administration | DIP Loan Advances | Sales Of Assets Pledged to USB | Cash Balance | Advances to Old SCA | Balance Outstanding | Actual Cash Balance — Cash Balance | Difference From Forecast Balance | Description |
|---|---|---|---|---|---|---|---|---|---|
| 3/19/2002 | | 204 | 0 | 0 | 204 | 1,939 | | | |
| 3/20/2002 | 141 | 0 | 0 | 141 | | 1,939 | | | Credit Card Cash |
| 3/20/2002 | 29 | 0 | 0 | 170 | | 1,939 | | | Other Revenues |
| 3/20/2002 | (174) | 0 | 0 | (4) | | 1,999 | | | Sabre Cure & Deposit - amount and timing subject to change |
| 3/20/2002 | (48) | 0 | 0 | (52) | | 1,999 | | | Worldspan Cure - amount and timing subject to change |
| 3/20/2002 | (30) | 0 | 0 | (82) | | 1,999 | | | Galileo/Apollo Cure & Deposit - amount and timing subject to change |
| 3/20/2002 | (17) | 0 | 0 | (99) | | 1,999 | | | Amadeus Cure & Deposit - amount and timing subject to change |
| 3/2/2002 | | 99 | 0 | 0 | 99 | 2,058 | | | |
| 3/2/2002 | 413 | 0 | 0 | 413 | | 2,058 | | | Riverside & Hobbit |
| 3/2/2002 | 47 | 0 | 0 | 460 | | 2,058 | | | Credit Card Cash |
| 3/2/2002 | (89) | 0 | 0 | 371 | | 2,058 | | | Tax Escrow |
| 3/22/2002 | | 0 | 0 | 371 | | 2,058 | | | |
| 3/22/2002 | 84 | 0 | 0 | 455 | | 2,058 | | | ARC Receipt |
| 3/22/2002 | (220) | 0 | 0 | 235 | | 2,058 | | | Misc. Bills |
| 3/22/2002 | (70) | 0 | 0 | 165 | | 2,058 | | | Ground Handling(Advance Payment on 60 departures @ 1900 per departure) |
| 3/22/2002 | (125) | 0 | 0 | 40 | | 2,058 | | | Fuel |
| 3/22/2002 | 47 | 0 | 0 | 87 | | 2,058 | | | Credit Card Cash |
| 3/25/2002 | | 0 | 0 | 87 | | 2,058 | | | |
| 3/25/2002 | 47 | 0 | 0 | 134 | | 2,058 | | | Credit Card Cash |
| 3/26/2002 | | 0 | 0 | 134 | | 2,058 | | | |
| 3/26/2002 | (70) | 0 | 0 | 64 | | 2,058 | | | Contractor Payments |
| 3/26/2002 | 47 | 0 | 0 | 111 | | 2,058 | | | Credit Card Cash |
| 3/27/2002 | | 0 | 0 | 111 | | 2,058 | | | |
| 3/27/2002 | 141 | 0 | 0 | 252 | | 2,058 | | | Credit Card Cash |
| 3/27/2002 | 29 | 0 | 0 | 281 | | 2,058 | | | Other Revenues |
| 3/27/2002 | (44) | 0 | 0 | 237 | | 2,058 | | | ELFC Engine Lease |
| 3/28/2002 | | 0 | 0 | 237 | | 2,058 | | | |
| 3/28/2002 | 47 | 0 | 0 | 284 | | 2,058 | | | Credit Card Cash |
| 3/28/2002 | (89) | 0 | 0 | 195 | | 2,058 | | | Tax Escrow |
| 3/28/2002 | 413 | 0 | 0 | 608 | | 2,058 | | | Riverside & Hobbit |
| 3/29/2002 | | 0 | 0 | 608 | | 2,058 | | | |
| 3/29/2002 | 84 | 0 | 0 | 692 | | 2,058 | | | ARC Receipt |
| 3/29/2002 | (220) | 0 | 0 | 472 | | 2,058 | | | Misc. Bills |
| 3/29/2002 | (70) | 0 | 0 | 402 | | 2,058 | | | Ground Handling(Advance Payment on 60 departures @ 1900 per departure) |
| 3/29/2002 | (125) | 0 | 0 | 277 | | 2,058 | | | Fuel |
| 3/29/2002 | 47 | 0 | 0 | 324 | | 2,058 | | | Credit Card Cash |
| 3/29/2002 | (430) | 0 | 0 | (106) | | 2,058 | | | Aircraft lease Deposits - estimated not based on a contract |
| | | 106 | 0 | 0 | 106 | 2,164 | | | |
| Totals | (2,596) | 2,164 | 0 | | 2,164 | | | | |

Items with uncertain timing

Total before other items

Est. cures in March (Office rent, engine lease, MSP airport & CRS vendors)
Mendota Office
Est. Other deposits(CRS, Delta, & Boeing)

feb and mar 2002 cash flow\Perky\tej revised march5a110M.xls

Near Term Cash

AMOUNTS ARE ESTIMATES - ALSO TIMING IS DIFFICULT TO PREDICT
Dollar amounts in thousands
Source (Use) of cash

| | Cash Activity | | | Forecast Transactions and Balances | | DIP Loan | | Actual Cash Balance | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Operations and Administration | DIP Loan Advances | Sales Of Assets Pledged to USB | Cash Balance | | Advances to Old SCA | Balance Outstanding | | Cash Balance | Difference From Forecast Balance | Boeing |

Excluded Items - ie items not included in the above tabulation

    Capital Infusion
    Investment banking fees

Notes

Forecast amounts Updated - February 28
Certain amounts are estimated
Timing is difficult to predict
Amounts and timing of cash holdbacks by credit card companies and ARC is difficult to predict
Aviation insurance payment is an estimate as to both amount and timing
The Notes to Confidential Financial Projections (which notes were updated Feb 28) are incorporated herein by reference
CRS vendor cures (if any) have not been negotiated - above amounts are not based on negotiations
Orlando Airport (MCO) has informed counsel that a cash cure will be required - no MCO cure is included in above
Nothing is included for miscellaneous cures that may be required
Cash is net of outstanding checks
USB - US Bank
SCA - Old Sun Country
Above is favorable to the forecast for 2002 - see reconciliation below

| | |
|---|---|
| March 31 cash per 2002 forecast | $571 |
| Equity contribution not in daily forecast | ($3,500) |
| Tax Payments now estimated to be lower | $100 |
| Payroll timing benefit | $190 |
| Lower deposits and cures | $300 |
| DIP Loan not in 2002 forecast | $2,164 |
| 2002 forecast as adjusted | ($175) |
| Cash at March 31 - per above | $0 |
| Difference | ($175) |

Therefore the daily forecast above is more optimistic than the 2002 forecast for March

feb and mar 2002 cash flow-Perkyjw] revised march5at10AM.xls

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                    )
                                          )
Sun Country Airlines, Inc.                )        Bankruptcy Case No. 02-40303
                                          )        Chapter 7
                    Debtor                )
                                          )
_____       )

## MEMORANDUM OF LAW IN SUPPORT OF U.S. BANK'S SUPPLEMENTAL MOTION FOR EXPEDITED RELIEF FROM THE AUTOMATIC STAY

U.S. Bank National Association ("U.S. Bank") by and through its duly authorized and undersigned attorneys, moves the Court for relief from the automatic stay imposed by 11 U.S.C. § 362 to proceed with its state law remedies. This motion (the "Supplemental Motion") supplements the motion of U.S. Bank originally heard by the Court on March 6, 2002 (the "Original Motion"), and continued by the Court until 2:00 p.m. on March 11, 2002

### FACTS

The facts offered in support of the Supplemental Motion and the Original Motion are set forth in the verified Notice of Expedited Hearing and Supplemental Motion of U.S. Bank for Relief from the Automatic Stay which has been filed and served herewith.

### ARGUMENT

Section 362(d) of the Bankruptcy Code provides that relief from the automatic stay can be granted if either (i) cause exists or (ii) the debtor lacks equity in the property and the property is not needed for an effective reorganization. These provisions are alternatives and as long as either is shown, relief may be granted. In re Wiesler, 934 F.2d 965, 968 (8th Cir. 1991).

A.      Cause Exists for Granting U.S. Bank Relief from the Stay

Section 362(d)(1) provides that a creditor is entitled to relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." The Bankruptcy Code does not define cause and therefore it must be determined on a

case-by-case basis after reviewing the totality of the circumstances. In re Wilson, 116 F.3d 87,

90 (3d Cir. 1997).

> A court may grant a party relief from the automatic stay if it finds
> that the moving party's interest in the property can be better
> protected or for any other cause the court finds to be worthy.

In re C. & S. Grain Co., Inc., 47 F.3d 233, 238 (7th Cir. 1995).

The possible sale to the prospective purchaser constitutes sufficient "cause" within the

meaning of § 362(d)(1) for the granting of relief from the stay.  Under a totality of the

circumstances approach, the following facts clearly demonstrate good cause for granting the

relief:  (i) both the Debtor and U.S. Bank (the only creditor secured by the Collateral) desire to

lift the stay to consummate a sale of the Collateral, (ii) the Debtor has no equity in the Collateral[1]

and has had very limited success over the last several months in finding an investor, purchaser or

other third party to take over its operations, (iii) the Debtor lacks sufficient financial resources to

continue its operations or even conduct an orderly Chapter 11 liquidation, (iv) no harm will come

to the unsecured creditors from a sale outside the bankruptcy process since there is no equity

available in the Collateral, (v) if it is possible to consummate a sale with MN Airlines, some of

the 900 people laid off by the Debtor may again have employment, (vi) the sale may not be

consummated if the value of the Collateral is diminished by being tied up in a bankruptcy

proceeding for any length of time, and (vii) if a quick sale of the Collateral cannot be

---

[1]   The amount owed by the Debtor to the Bank is approximately $13,900,000.  Given the Debtor's
extensive efforts to find a purchaser of its assets, the widespread publication of those efforts, the fact
that MN Airlines is the only bona fide interested purchaser, and the fact that the Purchase Price
($2,900,000) was heavily negotiated, the Purchase Price is the most accurate indicator of the fair
market value of the Purchased Assets. See In re Darios, 265 B.R. 279, 283 n.2 (Bankr. M.D. Fla.
2001) ("Fair market value is '[t]he price that a seller is willing to accept and a buyer is willing to pay
on the open market and in an arm's length transaction; the point at which supply and demand
intersect.'" (quoting BLACK'S LAW DICTIONARY 1549 (7th ed.1999)).  At the very least, the
Purchase Price creates a rebuttable presumption as to the value of the Purchased Assets and, thus, that
the Debtor has no equity in the Collateral.  If necessary, U.S. Bank will offer testimony to confirm the
Debtor's lack of equity.

2

accomplished, the Debtor may cease flight operations and may lose its flight certificate and any
real value left in the enterprise.  Granting U.S. Bank relief is appropriate under the totality of
circumstances and such relief provides U.S. Bank better protection of its interest in the
Collateral.

Aside from the need for a sale outside the context of a bankruptcy proceeding, cause
exists for granting relief from the stay because the Debtor cannot provide adequate protection to
U.S. Bank against the further diminution in the value of the Collateral.  Although § 362(d) does
not define cause, the one example it does provide is the lack of adequate protection of an interest
in the subject property.  The Debtor has been using collateral of U.S. Bank in the nature of
equipment and spare parts without compensating U.S. Bank for such use.  Use includes the use
of spare parts with respect to which U.S. Bank is unlikely to recover any value.  The Debtor also
has been using cash collateral to continue its operations.  Such operations have been conducted at
a loss and the Debtor has used all revenues from operations to fund continued operations. The
current cash flow projections provided by the Debtor indicate that without an immediate
financing, it will not be able to continue.  If it suspends or ceases operations again, there likely
will be minimal, if any, recovery of amounts already expended.  The Debtor has not been
providing adequate protection of U.S. Bank's interests and lacks sufficient funds to do so.  The
Debtor lacks sufficient sources of funds to assure U.S. Bank that the Collateral will not continue
to diminish in value during the pendency of its case.  If adequate protection of U.S. Bank's
interests cannot be assured, then relief from the stay is appropriate.

B.      Debtor Lacks Equity and the Collateral is not Necessary for a Reorganization

Section 362(d)(2) provides that a creditor should be granted relief from the automatic
stay:

(B)     with respect to a stay of an act against property under subsection (a) of this section, if--

    (A)     the debtor does not have an equity in such property; and

    (B)     such property is not necessary to an effective reorganization.

A debtor has "no equity in the property" when the debts secured by liens on the property exceed the value of the property. In re Bowman, 253, B.R. 233, 238 (B.A.P. 8th Cir. 2000). It is clear based on the valuation of the Collateral performed by U.S. Bank that the amount of obligations owed by the Debtor far exceed the value of the Collateral. As a consequence, the Debtor lacks equity in the Collateral.

In addition to the clear lack of equity, the Collateral is not necessary for a reorganization. In determining whether property is needed for a reorganization, courts apply a feasibility standard; whether the debtor has a reasonable possibility of a successful reorganization in a reasonable time. In re Clarkson, 767 F.2d 417, 420 (8th Cir. 1985); In re Lumber Exchange Ltd. Partnership, 125 B.R. 1000 (Bankr. D. Minn. 1991). Once a secured creditor demonstrates that the debtor lacks equity in the property, the burden shifts to the debtor to demonstrate that there is a reasonable possibility of a successful reorganization in a reasonable time. In re Anderson, 913 F.2d 530 (8th Cir. 1990); In re Bloomington HH Investors, Ltd. Partnership, 114 B.R. 174 (D. Minn. 1990). Moreover, in a Chapter 7 case only the lack of equity needs to be proven since there is no reorganization. B. N. Realty Associates v. Lichtenstein, 238 B.R. 249, 258 (S.D.N.Y. 1999).

Presently before this court is an involuntary Chapter 7 petition. Even if the Debtor were to acquiesce to a bankruptcy proceeding and convert such proceeding to a voluntary Chapter 11 case, the Debtor has done nothing to demonstrate that a reorganization in a reasonable time frame is possible. U.S. Bank believes that the Debtor's financial condition is such that it is

incapable of reorganizing. The Debtor has no present financing facilities available nor any other

immediate source of cash with which to reorganize. As a result of the substantial claims against

the Debtor by all classes of creditors, the inability to file a plan of reorganization that is feasible

or fair and equitable, its inability to secure additional equity or investors, and for other reasons,

this case is and will remain for all practical purposes a liquidation. As a consequence of the

Debtor's inability to reorganize, the Collateral is clearly not needed for a reorganization that will

never happen. When a debtor lacks equity in the property and there is no realistic chance of

reorganization, relief from the stay is appropriate. In re Albany Partners, Ltd., 749 F.2d 670

(11th Cir. 1984).

WHEREFORE, U.S. Bank requests that this Court enter an order (1) granting U.S. Bank

relief from the automatic stay in accordance with 11 U.S.C. § 362(d) to exercise its state law

remedies with respect to all of its the Collateral, (2) prohibiting the Debtor from using cash

collateral, and requiring the Debtor to segregate and account for cash collateral, and (3) granting

such other and further relief as the Court deems just under the circumstances.


Dated this 7th day of March, 2002.          DORSEY & WHITNEY LLP

                                            By: _____
                                            John C. Thomas (MN Bar # 109071)
                                            Diane Malfeld (MN Bar # 66849)
                                            Todd Pearson (MN Bar #230935)
                                            50 South Sixth Street
                                            Minneapolis, MN  55402
                                            (612) 340-2600

                                            ATTORNEYS FOR U.S. BANK
                                            NATIONAL ASSOCIATION


5

### AFFIDAVIT OF SERVICE BY MAIL

STATE OF MINNESOTA   )
                             ) ss
COUNTY OF HENNEPIN  )

     Paula Colucci, being first duly sworn, on oath, deposes and states that on the 7th day of March 2002, she did deposit in the United States mail envelopes properly sealed and with postage prepaid thereon, addressed to:

Richard R. Beresford, Esq.
Beresford, Booth, Demaray & Tingstad PLLC
145 Third Avenue South, Suite 200
Edmonds, WA  98020

Howard A. Schoenfeld., Esq.
Godfrey & Kahn
780 North Water Street
Milwaukee, WI  53202

Sun Country Airlines, Inc.
2820 Pilot Knob Road, Suite 250
Mendota Heights, MN  55120

Sun Country Airlines, Inc.
Minneapolis-St. Paul International Airport
7701 26th Avenue South
Minneapolis, MN  55450

William H. Erickson, Esq.
Day, Berry & Howard LLP
City Place
Hartford, CT  06103-3499

Richard M. Seltzer, Esq.
COHEN, WEISS and SIMON LLP
330 West 42nd Street
New York, New York  10036

Lisa A. Epps, Esq.
Scott J. Goldstein, Esq.
Spencer Fane Britt & Browne, LLP
1000 Walnut Street, Suite 1400
Kansas City, MO  64105

Joan Bettenburg, Esq.
ALPA Representation
7900 International Drive, Suite 850
Bloomington, MN  55425

Stephen C. Stapleton, Esq.
J. Christopher Luna, Esq.
Cowles & Thompson, P.C.
901 Main Street, Suite 4000
Dallas, TX  75202-3793

Elizabeth Ginsburg, Esq.
ALPA Legal Department
1625 Massachusetts Avenue, N.W.
Washington, D.C. 20036

the last known addresses of said addressees in which envelopes she had first placed true and correct copies of the attached:

1. Notice of Expedited Hearing and Supplemental Motion of U.S. Bank for Relief from the Automatic Stay;

2. Memorandum in Support of Supplemental Motion for Expedited Relief from the Automatic Stay; and

3. Proposed Order

Paula Colucci

Subscribed and sworn to before me this 7th day of March 2002.

**CHERYL L. FORD**
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2005

2

# DORSEY & WHITNEY LLP

MINNEAPOLIS
NEW YORK
SEATTLE
DENVER
WASHINGTON, D.C.
NORTHERN VIRGINIA
DES MOINES
LONDON
ANCHORAGE
SALT LAKE CITY
BRUSSELS

SUITE 1500
50 SOUTH SIXTH STREET
MINNEAPOLIS, MINNESOTA 55402-1498
TELEPHONE: (612) 340-2600
FAX: (612) 340-2868
www.dorseylaw.com

**JOHN C. THOMAS**
**(612) 340-7868**
**FAX (612) 340-2643**
**thomas.john@dorseylaw.com**

COSTA MESA
BILLINGS
FARGO
HONG KONG
GREAT FALLS
ROCHESTER
TOKYO
MISSOULA
VANCOUVER
TORONTO
SHANGHAI

March 7, 2002

**VIA MESSENGER**

Clerk
United States Bankruptcy Court
301 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

> Re:  Sun Country Airlines
>       Case No. 02-403-03

Dear Clerk:

Enclosed for filing herein please find the following:

1. Our check in the amount of $75;
2. Notice of Expedited Hearing and Supplemental Motion of U.S. Bank for Relief from the Automatic Stay;
3. Memorandum in Support of Supplemental Motion for Expedited Relief from the Automatic Stay;
4. Proposed Order; and
5. Affidavit of Service.

Sincerely,

John C. Thomas

Enclosures
cc:  Diane Malfeld, Esq.
     All Counsel on the attached Distribution List

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MINNESOTA

In re:                         )

                              )

Sun Country Airlines, Inc.      )     Bankruptcy Case No. 02-40303

                              )     Chapter 7

             Debtor        )

_____ )

## ORDER FOR RELIEF FROM THE AUTOMATIC STAY

The above-entitled matter came on for hearing before the above Court and the undersigned Judge on March 11th, 2002, upon the continued motion of U.S. Bank National Association ("U.S. Bank"), for an order for expedited relief from the automatic stay pursuant to 11 U.S.C. § 362(d) (the "Motion"). John C. Thomas, Esq. and Todd C. Pearson, Esq. appeared on behalf of the movant U.S. Bank. Other appearances are as noted in the record. Notice of the hearing on the Motion being adequate, and the Court, being fully advised of the premises, and based upon the Motion, all of the files and records in this case and the arguments of counsel:

IT IS HEREBY ORDERED THAT U.S. Bank's Motion for an Expedited Hearing on this matter is granted; and

IT IS HEREBY ORDERED THAT the automatic stay imposed by 11 U.S.C. § 362(a) is terminated as it applies to U.S. Bank, so that U.S. Bank may enforce and pursue any and all rights and remedies available to it under the Credit Agreement, Security Agreement, Engines and Parts Agreement, and Trademark Agreement and Supplemental Security Agreement (as all of the foregoing agreements are defined in the Motion) and under state law with respect to the Collateral (as defined in the Motion), including specifically, without limitation, the right to foreclose on and convey or otherwise dispose all of the Debtor's right, title and interest in such

Collateral in a manner consistent with the provisions of Article 9 of the Uniform Commercial

Code; *provided, however,* that if U.S. Bank conveys its collateral to MN Airlines, Inc. pursuant

to the Agreement for Sale of Collateral, any conveyance of the debtor's Flight Certificate issued

to the Debtor under 49 U.S.C. § 41102, shall be conditioned upon all necessary approvals or

exemptions of the Department of Transportation and any other necessary government approvals

with respect to the transfer of rights pertinent to the Flight Certificate; and

IT IS HEREBY ORDERED THAT notwithstanding Fed. R. Bankr. P. 4001(a)(3), this

Order is effective immediately.

_____

UNITED STATES BANKRUPTCY JUDGE

2